**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

Miguel Angel ESCALANTE, *et al.*,

        *Plaintiffs*,

   v.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, *et al.*,

        *Defendants*.

---

No. 1:22-cv_____

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR APPLICATION FOR A
TEMPORARY RESTRAINING ORDER**

## INTRODUCTION

Plaintiffs Miguel Angel Escalante, Kenet Jefet Hernandez Herrera, Anna Sorokin, and Ramon Dominguez Gonzalez (collectively, "Plaintiffs") are medically vulnerable people held by U.S. Immigration and Customs Enforcement ("ICE"), Acting Director of ICE Tae D. Johnson, and U.S. Department of Homeland Security ("DHS"), and DHS Secretary Alejandro N. Mayorkas (collectively "Defendants") at detention facilities while they await adjudication of their civil immigration cases. As COVID-19 has spread rapidly in ICE detention facilities, Plaintiffs fear for their health and their lives. Since the emergence of the Omicron variant, COVID-19 has surged in ICE detention centers. The number of COVID-19 infections in ICE detention grew by over 800 percent in January 2022 alone.[1] Over one in 20 people in ICE detention are currently infected with COVID-19.[2]

Plaintiffs, who are eligible for COVID-19 vaccine booster doses, have not been able to receive COVID-19 booster shots in detention. COVID-19 vaccine booster shots provide critical protection against serious illness and death from the virus: messenger RNA ("mRNA") booster shots are 90 percent effective against hospitalization due to the Omicron variant, in comparison to 57 percent for vaccinated people without boosters. Declaration of Dr. Tara Vijayan ("Vijayan Decl.") ¶ 21. A vaccinated person without an mRNA vaccine booster shot is approximately three and a half times more likely to be hospitalized and four times more likely to die from COVID-19 than a vaccinated person with an mRNA vaccine booster shot. Declaration of Dr. Eric Feigl-Ding

---

[1] Declaration of Nathalie E. Amazan ("Amazan Decl."), Ex. A, Camilo Montoya-Galvez, *Government Medical Advisors Urge ICE to Expand COVID-19 Vaccinations for Immigrant Detainees*, CBS NEWS (Jan. 26, 2022), https://www.cbsnews.com/news/immigration-ice-detainees-covid-19-vaccines/ (noting increase by 848 percent between January 3 and 26, 2022).
[2] Amazan Decl. Ex. B, ICE, *ICE Guidance on COVID-19: Detainee Statistics* (updated Feb. 28, 2022), https://www.ice.gov/coronavirus#detStat (noting that 1,001 of 18,203 people in ICE detention, or over five percent, have currently tested positive for COVID-19).

¶ 26 ("Feigl-Ding Decl."). For this reason, the federal government has repeatedly emphasized the importance of COVID-19 vaccine booster shots, encouraging the public to receive boosters as soon as they are eligible.[3] The Centers for Disease Control and Prevention (CDC) has likewise advised all detention centers to "provide COVID-19 vaccination, including boosters," to all those who are held or work in a detention facility.[4]

Plaintiffs, however, have not been able to receive booster shots. They have requested booster shots at their detention facilities, but they have been told that none are available, or that they should wait an indeterminate period of time, or their requests have simply been ignored. One Plaintiff, Mr. Dominguez Gonzalez, was offered only the Johnson & Johnson booster shot, which fails to provide adequate protection, and was told an mRNA booster shot is not available. The Johnson & Johnson booster shot provides limited protection against the Omicron variant, has a greater risk of serious side effects in comparison to the mRNA vaccines,[5] and falls below the established professional standard of medical care, unless there is a contraindication to the mRNA vaccine. Vijayan Decl. ¶¶ 23–24;[6] Feigl-Ding Decl. ¶ 24.

The CDC has instructed that detention facilities provide and ensure availability of

---

[3] *See, e.g.*, Amazan Decl. Ex. C,  Press Release, The White House, Statement by President Joe Biden on the Omicron COVID-19 Variant (Nov. 26, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/11/26/statement-by-president-joe-biden-on-the-omicron-covid-19-variant/ ("Get your booster shot now . . . .").

[4] Amazan Decl. Ex. D, CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Feb. 15, 2022), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[5] Amazan Decl. Ex. E, CDC, *Johnson & Johnson's Janssen COVID-19 Vaccine Overview and Safety*, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/janssen.html (updated Dec. 28, 2021) ("In most situations, Pfizer-BioNTech or Moderna COVID-19 vaccines are preferred over the J&J/Janssen COVID-19 vaccine for primary and booster vaccination due to the risk of serious adverse events.").

[6] Amazan Decl. Ex. F, CDC, *COVID-19 Vaccine Booster Shots*, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (updated Jan. 21, 2022).

COVID-19 vaccines, "including boosters," for all detainees.[7] In spite of this guidance, knowledge that ICE detains approximately 5,200 people who are medically vulnerable to serious illness and death from COVID-19,[8] and ample knowledge for at least four months that vaccine booster shots provide critically important protection against the virus, Defendants have done little to ensure that people in their custody can receive booster shots. As of this date, ICE has not given any instruction directing that its approximately 200 detention facilities provide mRNA COVID-19 booster shots to detained people. ICE also has no plan in place to ensure identification and notification of detained people who are eligible for booster shots, nor does it have any plan to educate detained people about the importance of booster doses. As a result, medically vulnerable people in immigration detention lack this basic, widely available, and critical protection against a lethal virus.

Plaintiffs bring this emergency request for a Temporary Restraining Order requiring Defendants to make available and provide them with mRNA COVID-19 vaccine booster shots in accordance with CDC guidance. Plaintiffs are likely to succeed on their claims that Defendants' failure to provide booster shots violates their Fifth Amendment due process rights by imposing an unreasonable risk to their health and safety, and constitutes unlawful punishment. Without prompt provision of COVID-19 vaccine booster shots, Plaintiffs in this case lack adequate protection against serious illness and death from COVID-19. The Temporary Restraining Order should be granted.

## I.     FACTUAL BACKGROUND

---

[7] CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, *supra* note 4.
[8] Amazan Decl. Ex. G, Camilo Montoya Galvez, *Coronavirus Infections inside U.S. Detention Surge by 520 Percent in 2022*, CBS NEWS (Jan. 14, 2022), https://www.cbsnews.com/news/immigration-detention-covid-cases-surge/.

**A. COVID-19 Vaccine Booster Shots Are Necessary to Protect Plaintiffs from Serious Illness and Death from COVID-19, Especially in Light of the Omicron Variant.**

COVID-19 continues to pose a significant risk of serious illness and death, with more than 4.4 million new cases and over 61,557 new deaths in the United States in the past four weeks alone.[9] The highly infectious Omicron variant, which began to spread widely in the United States in the past three months, is five times as contagious as the original form of the COVID-19 virus. Vijayan Decl. ¶ 9. As of February 19, 2022, nearly all COVID-19 cases in the United States were estimated to have been caused by the Omicron variant. *Id.*; Feigl-Ding Decl. ¶ 9. Although in many cases, the Omicron variant may cause mild illness, those with underlying medical conditions and who are immunocompromised continue to face a substantial risk of serious illness or death from COVID-19. Vijayan Decl. ¶ 10; Feigl-Ding Decl. ¶ 15.

Moreover, there is growing concern among medical experts and the CDC regarding the new "BA.2" subvariant of Omicron, which "has 17 additional mutations that the original Omicron BA.1 sublineage does not possess" and "is clearly displacing and out-competing all other variants across multiple countries, thereby posing a serious looming threat." Feigl-Ding Decl. ¶ 21. The BA.2 subvariant "is significantly more infectious than the BA.1 sublineage of Omicron, and seems to be even more severe." *Id.* ¶ 7. A recent study found that "[t]he viral RNA load in the lung periphery and histopathological disorders of BA.2 were more severe than those of [earlier subvariants of the Omicron variant]" and concluded that "the possibility that BA.2 would be the most concerned variant to global health," proposing "that BA.2 should be recognized as a unique variant of concern, and this [COVID-19] variant should be monitored in depth." *Id.* ¶ 23. In Denmark, where the BA.2 subvariant is the dominant form of COVID-19,

---

[9] Amazan Decl. Ex. H, Johns Hopkins University Coronavirus Resource Center, *COVID-19 Dashboard*, https://coronavirus.jhu.edu/map.html (last visited Feb. 28, 2022).

excess deaths attributable to the virus are surging. *Id.* The BA.2 subvariant has already jumped to 3.8 percent of COVID-19 cases in the United States as of February 19, 2022,[8] and is expected to increase as it has in other countries. *Id.* ¶¶ 21-23; Vijayan Decl. ¶ 10

The risk of spread of COVID-19 is heightened in high-risk settings such as ICE detention facilities. Vijayan Decl. ¶¶ 8, 15–18; Feigl-Ding Decl. ¶ 13. As the CDC has explained, "[p]eople in correctional and detention facilities are at greater risk for some illnesses, such as COVID-19, because of close living arrangements with other people."[10] Once present in a detention facility, COVID-19 spreads quickly. As a recent study has shown, COVID-19 case rates in ICE detention were, on average at least 5.3 times higher than in the state-matched U.S. population.[11] According to ICE's own data, 1,001 people in ICE detention facilities as of February 28, 2022 are currently positive for COVID-19, comprising over five percent of all detainees in custody.[12]

The risk of serious illness and death due to COVID-19 is greatest among those who are unvaccinated and those who are vaccinated and eligible for a booster shot but have not received one. Booster doses of mRNA vaccines are critical to preventing hospitalization and death caused by COVID-19, and to reduce transmission within a detention facility. Vijayan Decl. ¶ 20; Feigl-Ding Decl. ¶ 24. Recent data published by the CDC confirms that with the rise of the Omicron variant, mRNA vaccine booster shots (Pfizer-BioNTech and Moderna) are 90 percent effective

---

[10] Amazan Decl. Ex. I, CDC, *FAQs for Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/faq.html (updated Jan. 26, 2021).

[11] Amazan Decl. Ex. J, Nishant Uppal, Elizabeth Chin, and Parsa Erfani, *Trends in Decarceration, COVID-19 Cases, and SARS-CoV-2 Testing in U.S. Immigration Detention Centers from September 2020 to August 2021*, JAMA Network Open (Feb. 16, 2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2789087.

[12] ICE, *ICE Guidance on COVID-19: Detainee Statistics*, *supra* note 2.

against hospitalization, whereas two doses of the vaccine without the booster are only 57 percent effective against hospitalization. Vijayan Decl. ¶ 21. Fortunately, mRNA booster shots are also effective against the Omicron BA.2 subvariant. Feigl-Ding Decl. ¶ 28; Vijayan Decl. ¶ 11.

The federal government has repeatedly emphasized the importance of the COVID-19 vaccine booster shots. Since October 21, 2021, the CDC has encouraged all individuals 18 and older who are eligible and live in high-risk settings, which include ICE detention facilities, to receive a booster shot for protection against serious illness and death from COVID-19.[13] The White House issued a statement on December 2, 2021 that "[a]s we face the Omicron variant, boosters are more important than ever. Boosters increase the strength of your antibody response, so when the virus mutates, a booster makes it more likely that your antibodies can protect you against the new variant."[14] The CDC's COVID-19 guidance for correctional and detention facilities instructs that facilities should "at all times" "provide COVID-19 vaccination, including boosters."[15]

Under current CDC guidance, all individuals who initially received a Pfizer-BioNTech or Moderna vaccine are eligible for a COVID-19 booster shot once five months have elapsed after completion of their primary vaccination series. Individuals who received a Johnson & Johnson

---

[13] Amazan Decl. Ex. K, Press Release, CDC, *CDC Expands Eligibility for COVID-19 Booster Shots* (Oct. 21, 2021), https://www.cdc.gov/media/releases/2021/p1021-covid-booster.html.

[14] Amazan Decl. Ex. L, Press Release, The White House, *President Biden Announces New Actions to Protect Americans Against the Delta and Omicron Variants As We Battle COVID-19 This Winter* (Dec. 2, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/12/02/fact-sheet-president-biden-announces-new-actions-to-protect-americans-against-the-delta-and-omicron-variants-as-we-battle-covid-19-this-winter/; *see also* Amazan Decl. Ex. M, The White House, *President Biden on the Omicron Variant: Vaccination and Boosters Offer High Level of Protection*, YOUTUBE (Dec. 28, 2021), https://www.youtube.com/watch?app=desktop&v=aQj4ecpAMUQ; Press Release, CDC, *CDC Expands COVID-19 Booster Recommendations*, *supra* note 11.

[15] CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, *supra* note 4.

vaccine are eligible for a COVID-19 booster two months after completion of their primary vaccination dose. The CDC recommends that everyone 18 and older—and, in the case of individuals who initially received a Pfizer-BioNTech vaccine, 12 and older—receive a booster shot.[16] In cases where a patient has recently developed COVID-19, vaccines can be provided after symptoms have subsided and criteria for ending isolation is met (currently at least five days after a positive test and as long as symptoms improve. Vijayan Decl. ¶ 22.

A booster shot of an mRNA vaccine such as Moderna or Pfizer-BioNTech is necessary to provide effective immunity against the Omicron variant. It is now clear that mRNA vaccines produce immunologically superior responses when used as a booster dose and are highly preferable to the viral vector Johnson & Johnson vaccine. Vijayan Decl. ¶ 23; Feigl-Ding Decl. ¶¶ 24-25. The CDC has also clarified that "Pfizer-BioNTech or Moderna COVID-19 vaccines are preferred over the J&J/Janssen COVID-19 vaccine for primary and booster vaccination due to the risk of serious adverse events."[17] Indeed, the CDC instructs that, prior to vaccination, patients "should be informed that mRNA vaccines are preferred over the [Johnson & Johnson] COVID-19 Vaccine" and that "[a]ll people who elect to receive a Janssen COVID-19 Vaccine booster should be informed about the risk and symptoms of TTS [(thrombosis with thrombocytopenia syndrome—a blood clotting disease)] that could occur after vaccination . . . and the availability of mRNA COVID-19 vaccines instead of the Janssen COVID-19 Vaccine."[18]

As a result, the established standard of medical care is to provide mRNA booster shots to

---

[16] CDC, *COVID-19 Vaccine Booster Shots*, *supra* note 6.

[17] CDC, *Johnson & Johnson's Janssen COVID-19 Vaccine Overview and Safety*, *supra* note 5.

[18] Amazan Decl. Ex. N, CDC, *Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Approved or Authorized in the United States* (Jan. 6, 2022), https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html#considerations-covid19-vax-booster.

eligible patients; offering only a Johnson & Johnson vaccine booster, absent a medical contraindication, would fall below the established standard of care. Feigl-Ding Decl. ¶ 25; Vijayan Decl. ¶ 24; *see also* Amazan Decl. Ex. O (Letter from Concerned Medical Faculty to DHS Secretary Alejandro Mayorkas and ICE Acting Director Tae D. Johnson, Jan. 27, 2022); Amazan Decl. Ex. P (Letter from DHS Medical Experts Dr. Scott Allen and Dr. Josiah Rich to DHS Secretary Mayorkas and ICE Acting Director Johnson, Jan. 26, 2022).

In light of this evidence, the CDC has formally recommended in its guidance that the Johnson & Johnson vaccine should only be given as a booster shot in rare circumstances, such as if someone "[h]ad a severe reaction after an mRNA vaccine dose" or "ha[s] a severe allergy to an ingredient of Pfizer-BioNTech or Moderna," if they "[w]ould otherwise remain unvaccinated for COVID-19 due to limited access to Pfizer-BioNTech or Moderna," or "[w]ants to get the J&J/Janssen COVID-19 vaccine despite the safety concerns."[19]

Defendants have no plausible argument that they have "limited access to Pfizer-BioNTech or Moderna" to provide mRNA booster shots to people in their custody. The mRNA vaccines continue to be widely available in the United States. Indeed, the CDC issued its guidance in support of the use of mRNA boosters noting that "the U.S. supply of mRNA vaccines is abundant – with nearly 100 million doses in the field for immediate use." Vijayan Decl. ¶ 25; *see also* Feigl-Ding Decl. ¶ 25.

---

[19] CDC, *Johnson & Johnson's Janssen COVID-19 Vaccine Overview and Safety*, *supra* note 4.

**B.  Without mRNA Vaccine Booster Shots, Medically Vulnerable Plaintiffs Face a Heightened and Unreasonable Risk of Serious Illness and Death from COVID-19.**

Plaintiffs in this case are all medically vulnerable to COVID-19. They have been diagnosed with medical conditions such as HIV, chronic kidney infection, neurocognitive disorder, post-traumatic disorder, and obesity. Declaration of Miguel Angel Escalante ("Escalante Decl.") ¶ 2; Declaration of Kenet Jefet Hernandez Herrera ("Hernandez Herrera Decl.") ¶ 2; Declaration of Anna Sorokin ("Sorokin Decl.") ¶ 2; Declaration of Ramon Dominguez Gonzalez ("Dominguez Gonzalez Decl.") ¶ 2. According to the CDC, individuals with these and certain other medical conditions "are more likely to get severely ill from COVID-19."[20] Severe illness means that a person with COVID-19 may be hospitalized, need intensive care, require a ventilator to help them breathe, or die.[21] Without booster shots, specifically mRNA booster shots, Plaintiffs are particularly vulnerable to COVID-19 infection and severe illness, including death. Vijayan Decl. ¶¶ 6–7.

**1.  Plaintiffs Suffer from Medical Conditions that Place Them at Risk of Serious Illness or Death from COVID-19.**

Plaintiff Miguel Angel Escalante is a 36-year-old man who has been detained by ICE at the Florence Correctional Center ("Florence") in Florence, Arizona since approximately January 3, 2022. Escalante Decl. ¶ 1. He has been in ICE custody since July 2020 in various different facilities in Arizona. *Id.* Mr. Escalante is HIV-positive and has a weakened immune system, which makes him vulnerable to serious illness or death from COVID-19. *Id.* ¶ 2. ICE is aware of his medical conditions because he has filed five requests for release, including under *Fraihat v.*

---

[20] Amazan Decl. Ex. Q, CDC, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#:~:text=Having%20heart%20conditions%20such%20as,severely%20ill%20from%20COVID%2D19 (updated Dec. 14, 2021).
[21] *Id.*

*U.S. Immigration & Customs Enforcement*, which requires ICE to "make timely custody determinations for" medically vulnerable detainees like Plaintiffs. 445 F. Supp. 3d 709, 751 (C.D. Cal. 2020), *overruled by* 16 F. 4th 613 (9th Cir. 2021). *Id*. ¶ 3. His most recent denial was on January 11, 2022. *Id*. ¶ 3. Mr. Escalante received one dose of the Johnson & Johnsons vaccine around May 20, 2021 while in ICE custody at La Palma Correctional Center. *Id*. ¶ 4.

Mr. Escalante has made repeated requests for a booster shot. *Id*. ¶ 6. First, in November 2021, he asked the nurse staff at La Palma Correctional Center for a booster, but they informed him that they did not have them at that time. *Id*. After Mr. Escalante was transferred to Florence, he requested a booster shot from a nurse at intake. *Id*. Again, he was told that they were not available. *Id*. Mr. Escalante subsequently requested the booster shot two more times, after which a nurse informed him that he would be placed on a waiting list. *Id*. Mr. Escalante has been on this waiting list for about a month, and has yet to receive a COVID-19 booster. *Id*. He also does not know any other detainee at Florence who has received a booster shot. *Id*. ¶ 7. Mr. Escalante is extremely worried about contracting COVID-19 because of his HIV status and the frequent number of people moving through the facility. *Id*. ¶ 8. In particular, he wants to receive an mRNA vaccine for more protection from the virus. *Id*.

Plaintiff Kenet Jefet Hernandez Herrera is a 24-year-old man who has been detained by ICE at the Eloy Detention Center ("Eloy") in Eloy, Arizona since approximately June 2021. Hernandez Herrera Decl. ¶ 1. Mr. Hernandez Herrera has several conditions that make him vulnerable to serious illness or death from COVID-19, including post-traumatic stress disorder, anxiety disorder, and mild neurocognitive disorder. Hernandez Herrera Decl. ¶ 2. He is also a former smoker. *Id*.  ICE is aware of his medical conditions because he was diagnosed and prescribed medication for his anxiety disorder at Eloy. *Id*. ¶ 3. He was not vaccinated for

COVID-19 until around July 14, 2021, when he received one dose of the Johnson & Johnson vaccine. *Id*. ¶ 4.

Since then, Mr. Hernandez Herrera has requested the COVID-19 booster shot at least twice while at Eloy. *Id*. He first submitted a request in writing in early to mid-January 2022, but he never received a response. *Id*. ¶ 9. Later in January, he requested a booster shot while speaking with medical staff, but he was told that they were not available. *Id*. He also does not know any other detainees at Eloy who have received a COVID-19 booster shot. *Id*. ¶ 10. Mr. Hernandez Herrera has already been sick with COVID-19 once before, in June 2021, when he had serious symptoms including difficulty breathing, a high fever, and extended cough. *Id*. ¶ 8. He therefore wants a booster shot in order to protect himself from getting seriously ill from COVID-19 in the future. *Id*. ¶ 7. He fears that he is already in danger at Eloy, where the guards have mixed healthy people with those who are infected with COVID-19. *Id*.

Plaintiff Anna Sorokin is a 31-year-old woman who has been detained by ICE at the Orange County Correctional Facility ("Orange County") in Goshen, New York since June 7, 2021. Sorokin Decl. ¶ 1. She was previously detained by ICE at the Bergen County Correctional Facility since approximately March 25, 2021. *Id*. She has several medical conditions that make her vulnerable to serious illness or death from COVID-19, including a chronic kidney infection as well as depression, anxiety, and post-traumatic stress disorder. *Id*. ¶ 2. ICE is aware of her medical conditions because she had been considered but denied release under *Fraihat* around April 1, 2021, and she has recently submitted two new *Fraihat* requests in February 2022, including information about her kidney condition. *Id*. ¶ 3. She was vaccinated for COVID-19 around April 2021, when she received one dose of the Johnson & Johnson vaccine while detained by ICE at Bergen County Correctional Facility. *Id*. ¶ 4.

11

Ms. Sorokin has made multiple requests for a booster shot. *Id.*  ¶ 7. First, she submitted a sick call slip in December 2021, stating that she wanted a booster. *Id.*  She never received a response. *Id.* Then around January 19, 2022, she experienced her first bout of COVID-19, during which she had a fever, persistent cough, nausea, migraines, and body aches. *Id.* ¶ 5.  Even after she left quarantine on January 29, 2022, she continued to experience lingering effects including fatigue, coughing, brain fog and shortness of breath. *Id.* After leaving quarantine on January 29, 2022, Ms. Sorokin requested the booster again when she had a medical visit for a general check-up. *Id.* ¶ 7. Although a nurse told her that she would be seen by a doctor to address this, she never heard anything about a booster shot since then. *Id.* She has not heard of any other detained people getting a booster shot in Orange County, and has not seen any information distributed about boosters. *Id.*  ¶ 9. She feels especially frustrated that she contracted COVID-19 after Orange County failed to give her a booster shot upon her initial request, and she feels that the staff have left her and other detainees unprotected in the facility. *Id.* ¶ X. Ms. Sorokin still would like a booster shot as soon as she is medically eligible for one, as she is concerned about getting sick from COVID-19 if she contracts it again. *Id.* ¶ 10.

Plaintiff Ramon Dominguez Gonzalez is a 32-year-old man who has been detained by ICE at the Imperial Regional Adult Detention Facility ("Imperial") in Calexico, California since approximately January 2019. Dominguez-Gonzalez Decl. ¶ 1. Mr. Dominguez Gonzalez is clinically obese and has difficulty breathing. Dominguez-Gonzalez Decl. ¶ 2. ICE is aware of his medical vulnerability to COVID-19 because in October 2020, Mr. Dominguez Gonzalez filed a request for release on the basis of his medical conditions under *Fraihat. Id.* ¶ 3. He received a single dose of the Johnson & Johnson vaccine around March 2021, meeting the required two-month wait period to be eligible for a booster shot. *Id.* ¶ 4.

Mr. Dominguez Gonzalez has made multiple requests for a booster shot at Imperial, yet has been unable to receive one. *Id.* ¶ 6. Initially, after submitting a request through a sick call slip in early December 2021, he was told by a nurse that they would get back to him, but they never did. *Id.* Later in the month, he requested the booster shot again at a mental health appointment, but he never received one. *Id.* Mr. Dominguez Gonzalez then submitted another sick call request inquiring about the booster around January 8, 2022, but no one explained to him why he had not yet received a booster. *Id.* Shortly after, on January 17, 2022, Mr. Dominguez Gonzalez tested positive for COVID-19. He fell ill, including suffering a fever, cough, and shortness of breath. *Id.* ¶ 7. Earlier in February 2022, as many as nine out of 12 housing units in Imperial were under quarantine for COVID-19 exposure. *Id.* ¶ 9.

Mr. Dominguez Gonzalez continued to test positive for COVID-19 until January 27, 2022, when he was released from quarantine. *Id.* Although he became eligible for the booster, he was not offered a booster until February 23, 2022, and his only option was the Johnson & Johnson booster. Mr. Dominguez Gonzalez declined the Johnson & Johnson booster based on his understanding of CDC and medical expert recommendations for mRNA boosters. Mr. Dominguez Gonzalez wants an mRNA booster shot to receive protection and prevent himself from getting sick from COVID-19 again. He still has breathing issues, and has no confidence in the staff at Imperial, as he has seen them eschew COVID-19 protocols, like going to work while still sick. *Id.* ¶ 10.

All Plaintiffs have been detained for at least several months, if not years, despite their medical vulnerability to COVID-19.  Escalante Decl. ¶ 1-2; Hernandez Herrera Decl. ¶ 1-2; Sorokin Decl. ¶ 1-2; Dominguez Gonzalez Decl. ¶ 1-2.

### 2.  Plaintiffs Have Been Unable to Obtain COVID-19 Booster Shots in ICE Detention.

Plaintiffs have all received their primary COVID-19 vaccine doses, and enough time has elapsed for each of them to receive a COVID-19 booster shot.  Escalante Decl. ¶ 4; Hernandez Herrera Decl. ¶ 4; Sorokin Decl. ¶ 4; Dominguez Gonzalez Decl. ¶ 4. They have requested booster shots, only to be told that none are available or that they should wait an indeterminate time, or their requests have been simply ignored.  Escalante Decl. ¶ 6; Hernandez Herrera Decl. ¶ 9; Sorokin Decl. ¶ 7; Dominguez Gonzalez Decl. ¶ 6 Plaintiffs have not received booster shots, leaving them acutely vulnerable to COVID-19 infection and serious illness.  Escalante Decl. ¶¶ 5-6; Hernandez Herrera Decl. ¶¶ 2, 8; Sorokin Decl. ¶ 7-8; Dominguez Gonzalez Decl. ¶¶ 2, 6. Defendants have not provided Plaintiffs any information or education about booster shots. Escalante Decl. ¶ 7; Hernandez Herrera Decl. ¶ 6; Sorokin Decl. ¶ 9. Plaintiffs report that they are aware of the existence and benefits of booster shots only from watching television, reading the news, or conversations with loved ones.  Escalante Decl. ¶ 5; Sorokin Decl. ¶ 9; Dominguez Gonzalez Decl. ¶ 10.

### C.  Defendants Have Failed to Provide COVID-19 Vaccine Boosters to Immigrant Detainees.

It is evident that Defendants lack any consistent plan to ensure that eligible detainees, such as Plaintiffs, are provided with COVID-19 booster shots. ICE's current version of the Pandemic Response Requirements ("PRR"), which establishes COVID-19 mitigation requirements for detention facilities that hold ICE detainees, contains no provision regarding

booster doses, even though the CDC has encouraged eligible individuals, including Plaintiffs, to receive a booster shot since October 21, 2021.[22]  The ICE Health Service Corps ("IHSC") COVID-19 Vaccination Guidelines and Protocol, issued on January 25, 2021, applies only to approximately 20 of ICE's 200 detention facilities nationwide, and provides no guidance whatsoever regarding booster shots.[23] ICE's failure to adopt a system-wide booster shot plan is clear from the paltry number of booster shots it has administered to individuals in its custody. Over four months, between November 2021 and February 21, 2022 (when data was last made public), Defendants have provided a mere total of 1,436 boosters to people detained in ICE detention facilities despite holding between 18,800 to 22,000 people on a day-to-day average.[24]

Defendants' failure to provide booster shots to eligible detainees carries particularly severe consequences for medically vulnerable detainees. According to a recent news report, as of late December 2021, ICE detained approximately 5,200 immigrants whose health issues or age place them at higher risk of severe illness or death if they contract COVID-19.[25] Under the terms

---

[22] Amazan Decl. Ex. R, ICE, *ICE ERO COVID-19 Pandemic Response Requirements (Version 7.0)* 6 (Oct. 19, 2021), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf (providing that the PRR "sets forth expectations and assists ICE detention facility operators in sustaining detention operations while mitigating risk to the safety and wellbeing of detainees, staff, contractors, visitors, and stakeholders due to COVID-19").

[23] Amazan Decl.  Ex. S,  ICE Health Service Corps, *COVID-19 Vaccination Guidelines and Protocol, OM-21-001* (Jan. 25, 2021); Amazan Decl. Ex. T, *ICE Health Service Corps Fiscal Year 2020* 34 (2021),  https://www.ice.gov/doclib/ihsc/IHSCFY20AnnualReport.pdf.

[24] Declaration of Dr. Ada Rivera, *Shaikh v. U.S. Immigr. & Customs Enf't*, No. 1:22-cv-00231, ¶ 31 (D.D.C. Feb. 24, 2022), ECF No. 22-6; Camilo Montoya-Galvez, *Coronavirus Infections inside U.S. Immigration Detention Centers Surge by 520% in 2022*, *supra* note 8 (noting daily average of 22,000 detainees); Amazan Decl. Ex. JJ, ICE, *ICE Guidance on COVID-19: ICE Detainee Statistics* https://web.archive.org/web/20220222183148/https://www.ice.gov/coronavirus (updated Feb. 22, 2022) (noting daily average of 18,800 detainees in custody as of February 21, 2022).

[25] Camilo Montoya-Galvez, *Coronavirus Infections inside U.S. Immigration Detention Centers Surge by 520% in 2022*, *supra* note 8.

of a preliminary injunction that remains in effect, ICE is required to review their medical histories and consider releasing these individuals from detention.[26] Nevertheless, many medically vulnerable individuals remain detained in ICE custody, often for several months, if not years.

Compounding the danger of ICE's failure to adopt a booster shot plan is its reliance on the Johnson & Johnson vaccine for detainees' primary vaccine dose,[27] which is less effective against COVID-19 variants. Each Plaintiff has only received one dose of the Johnson & Johnson vaccine. Escalante Decl. ¶ 4; Hernandez Herrera Decl. ¶ 4; Sorokin Decl. ¶ 4; Dominguez Gonzalez Decl. ¶ 4. Recent data show that mRNA vaccines are most effective at reducing viral transmission and controlling COVID-19 infections, as compared to the Johnson & Johnson vaccine which also carries a greater risk of serious side effects. Vijayan Decl. ¶¶ 21, 23; Feigl-Ding Decl. ¶¶ 25, 30. Studies also show that the Johnson & Johnson vaccine does not produce sufficient quantities of antibodies against Omicron.[28] Vijayan Decl. ¶¶ 21, 23. In fact, due to

---

[26] *Fraihat v. ICE*, 445 F. Supp. 3d 709 (C.D. Cal. 2020), *overruled by Fraihat v. ICE*, 16 F.4th 613 (9th Cir. 2021); *see also* 9th Cir. R. 41-2 (timing of mandate) (providing that a mandate will issue seven days after the time to file a motion for reconsideration expires); Order Granting Appellees' Second Unopposed Motion for Extension of Time to File Petition for Rehearing, *Fraihat v. ICE*, No. 20-55634 (9th Cir. Jan. 4, 2022), ECF No. 88 (requiring petition for rehearing to be filed on or before Apr. 5, 2022).

[27] Amazan Decl. Ex. U, Priscilla Alvarez, *DHS Begins Administering J&J Vaccine to Immigrant Detainees*, CNN POLITICS (July 13, 2021), https://www.cnn.com/2021/07/13/politics/immigrant-detainees-vaccine-dhs/index.html; Amazan Decl. Ex. P, Letter from DHS Medical Experts Dr. Scott Allen and Dr. Josiah Rich to DHS Secretary Mayorkas and Acting ICE Director Johnson, at 3 (Jan. 26, 2022), https://whistleblower.org/wp-content/uploads/2022/01/012622-LETTER-TO-MAYORKAS-FROM-DRS-RE-COVID-IN-IMM-DETENTION.pdf ("DHS has offered vaccination to detainees with the single shot Johnson & Johnson (J&J) vaccine, an approach that at one time was appropriate.").

[28] Amazan Decl. Ex. V, Wesley H. Self, MD, et al., *Comparative Effectiveness of Moderna, Pfizer-BioNTech, and Janssen (Johnson & Johnson) Vaccines in Preventing COVID-19 Hospitalizations Among Adults Without Immunocompromising Conditions — United States, March–August 2021*, CDC (Sep. 24, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7038e1.htm.

efficacy concerns, the CDC has even authorized *second* mRNA booster doses for those who originally received a Johnson & Johnson vaccine.[44]

1.  **Defendants Knew of the Risk Posed to Plaintiffs by Their Failure to Provide COVID-19 Booster Shots.**

Defendants are aware that Plaintiffs are medically vulnerable. All of the Plaintiffs have been diagnosed with medical conditions while in ICE custody or have submitted requests for release to ICE referencing their medical conditions, including requests under the terms of the preliminary injunction issued in *Fraihat*, which requires ICE to "make timely custody determinations for" medically vulnerable detainees like Plaintiffs. Escalante Decl. ¶ 3; Hernandez Herrera Decl. ¶ 3; Sorokin Decl. ¶ 3; Dominguez Gonzalez Decl. ¶ 3; *see also* 445 F. Supp. 3d at 751, *supra* note 26.

Defendants should be, and are, aware of the danger posed by COVID-19 to individuals in its care, and of the critical importance of boosters. As noted above, federal government officials as well as the CDC have repeatedly made public announcements underscoring the vital role booster shots play in protecting public health and mitigating the spread of COVID-19. Moreover, on December 15, 2021, the American Civil Liberties Union (ACLU) sent a letter to DHS Secretary Alejandro Mayorkas and ICE Acting Director Tae Johnson urging them to "take immediate action to address" the agency's failure to adopt and implement a booster shot plan "before further harm is done to the people in ICE custody and the community at large."[29] On January 26, 2022, Dr. Scott Allen and Dr. Josiah Rich, who serve as medical experts for DHS, sent a letter to Secretary Mayorkas and Acting Director Johnson, warning of the urgent need for ICE to provide COVID-

---

[29] Amazan Decl. Ex. W, Letter from ACLU, to DHS Secretary Mayorkas and ICE Acting Director Johnson (Dec. 15, 2021), https://www.aclu.org/letter/letter-demanding-dhs-provide-covid-19-vaccine-boosters-people-ice-detention.

19 vaccination and boosters to detainees.[30] And on February 15, 2022, the CDC itself updated its official guidance for correctional and detention facilities, instructing that all people living and working in these facilities should be ensured access to COVID-19 vaccines and boosters.[31]

### 2. Other Custodial Agencies Have Shown That Boosters Can Be Made Available, Underscoring ICE's Failure.

ICE's ongoing failure to provide booster shots stands in contrast to the approach taken by other custodial entities, including the Federal Bureau of Prisons (BOP) and state departments of correction. The BOP's COVID-19 Vaccine Guidance, issued on October 13, 2021, provides that BOP would offer the Pfizer-BioNTech COVID-19 booster shot to individuals who were then eligible for it under CDC guidance.[32] The District of Columbia's Department of Corrections announced on December 22, 2021 that it "continues to offer a COVID-19 vaccine to all residents and is offering the booster to all residents who are eligible."[33] Moreover, multiple state departments of correction have administered many thousands of booster shots to people in their custody.[34] For example, as of February 18, 2022, the Michigan Department of Corrections has

---

[30] Letter from Dr. Scott Allen and Dr. Josiah Rich, *supra* note 27.

[31] CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, *supra* note 4.

[32] Amazan Decl. Ex. X, Fed. Bureau of Prisons, Clinical Guidance, *COVID-19 Vaccine Guidance*, Version 14.1, 5–6 (Oct. 13, 2021),
https://www.bop.gov/resources/pdfs/covid_19_vaccine_guidance_v14_0_2021.pdf.

[33] Amazan Decl. Ex. Y, Gov't of the Dist. of Columbia, Dep't of Corr., *Coronavirus Prevention* (Dec. 22, 2021),
https://web.archive.org/web/20220205062215/https://doc.dc.gov/page/coronavirus-prevention.

[34] *See, e.g.*, Amazan Decl. Ex. Z, Delaware Dep't of Corr., *Active COVID-19 Cases (Offenders)*, https://doc.delaware.gov/assets/documents/Confirmed_COVID_Cases.pdf (updated Feb. 28, 2022) (noting that "1,593 vaccinated inmates have received a booster"); Amazan Decl. Ex. AA, Missouri Dep't of Corr., *COVID-19 Data*, https://doc.mo.gov/media-center/newsroom/covid-19/data (last visited Feb. 28, 2022) (boosters administered to 4,158 inmates); Amazan Decl. Ex. BB, Minnesota Dep't of Corr., *MN DOC COVID-19 Data Dashboard*, https://mn.gov/doc/about/covid-19-updates/ (last updated Feb. 24, 2022) (34 percent of incarcerated population fully vaccinated and boosted).

administered 11,398 booster shots to individuals in its custody (over a third of the total

incarcerated population of 32,273 people).[35]

ICE's failure to provide COVID-19 vaccine boosters is not an anomaly for the agency.

ICE's sluggish vaccine roll-out in 2021 does not bode well for people like Plaintiffs who rely on

Defendants to promptly provide them booster shots. As early as January 25, 2021, ICE

Enforcement and Removal Operations (ERO) suggested that the ICE Health Service Corps

(IHSC) add COVID-19 vaccine guidelines and protocols to the next version of the PRR, to

ensure "across the board implementation."[36] As an ICE official stated in an email, "[u]ltimately

we should have a consistent, comprehensive rollout for all 200+ facilities within our detention

network [as] opposed to only IHSC staffed facilities."[37] This email concerned ICE PRR version

6.0, but that document was not released until nearly two months later, on March 16, 2021.[38]

What is more, the ICE PRR 6.0 did not, in fact, engage in any "consistent" or "comprehensive"

rollout at all, and the agency failed to supply detention facilities with vaccine doses, leaving

vaccine rollout up to each facility.[39] Defendants did not update their policy regarding vaccine

procurement until six months later, after a court order.[40]

## II.   LEGAL STANDARD

---

[35] Amazan Decl. Ex. CC, Michigan.gov, *COVID-19 Dashboard*,
https://www.michigan.gov/coronavirus/0,9753,7-406-98178_103214-547150--,00.html (last
updated Feb. 25, 2022).

[36] Amazan Decl. Ex. DD, E-mail from Ricardo Wong, Dep. Asst. Dir., Detention Management
Division, to Ada Rivera, Dep. Assistant Dir. Clinical Services, ICE Health Services Corps (Jan.
25, 2021, 2:47 PM).

[37] *Id*.

[38] Amazan Decl. Ex. EE, ICE, *ICE Pandemic Response Requirements (Version 6.0)* (Mar. 16,
2021), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-
v6.pdf.

[39] *Id*. at 24.

[40] *Fraihat v. ICE, No. 5:19-cv-1546-JGB-SHK* (C.D. Cal. June 23, 2021), 2021 WL 2580512.

To obtain a temporary restraining order, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008); *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014); *Sibley v. Obama*, 810 F. Supp. 2d 309, 310 (D.D.C. 2011) (articulating the elements of a temporary restraining order based on the preliminary injunction standard). Courts in this Circuit have traditionally applied these factors on a sliding scale, where a stronger showing on some factors can compensate for a weaker showing on others. *See, e.g.*, *Davenport v. Int'l Brotherhood of Teamsters*, 166 F.3d 356, 360 (D.C. Cir. 1999). It has been suggested, but not decided, that a likelihood of success on the merits may be required. *See Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (citing *Winter*, 555 U.S. at 20–22). Under either approach, Plaintiffs make the necessary showing.

## III.   ARGUMENT

### A.  Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs are likely to establish that Defendants' failure to provide them with COVID-19 vaccine booster shots poses an unreasonable risk to their health and constitutes punishment as it lacks a rational relationship to any legitimate governmental interest, in violation of their Fifth Amendment substantive due process rights.

### 1.  Defendants' Failure to Provide COVID-19 Vaccine Booster Shots Violates Plaintiffs' Substantive Due Process Rights Under the Fifth Amendment Because It Poses an Unreasonable Risk to Plaintiffs' Health.

Whenever the government detains or incarcerates someone, it has an affirmative duty to provide conditions of reasonable health and safety as well as reasonably adequate medical care. As the Supreme Court has explained, "when the State takes a person into its custody and holds

20

him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). As a result, the government must provide those in its custody with "food, clothing, shelter, medical care, and reasonable safety . . . ." *Id*. at 200.

The Eighth Amendment prohibits the government from exposing prisoners to "an unreasonable risk of damage to their health." *Banks v. Booth*, 468 F. Supp. 3d 101, 110 (D.D.C. 2020), *appeal dismissed, cause remanded*, 3 F.4th 445 (D.C. Cir. 2021). The Eighth Amendment similarly prohibits the government from disregarding a "serious medical need" that causes an "excessive risk" to a prisoner's health and safety. *Baker v. Dist. of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). To show a violation of the Eighth Amendment, prisoners must demonstrate that a government official acted with deliberate indifference, where the official had subjective knowledge of and recklessly disregarded the excessive risk to the prisoner's health or safety. *Baker*, 326 F.3d at 1306.

The same basic principles apply to immigrant detainees, with an important distinction. Plaintiffs are "civil immigration detainees . . . protected by the Fifth Amendment's Due Process Clause." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 210 (D.D.C. 2020). Like pre-trial detainees, civil immigrant detainees "have not been convicted of any present crime," and they "may not be subjected to punishment of any description." *Id.* As the Supreme Court concluded in *Kingsley v. Hendrickson*, pre-trial detainees bringing excessive force claims need only demonstrate that the use of force was objectively unreasonable. 576 U.S. 389, 397 (2015). Following the Supreme Court's instruction, this District has concluded that pre-trial detainees "do not need to show deliberate indifference in order to state a due process claim for inadequate conditions of confinement." *Banks*, 468 F. Supp. 3d at 111. Instead, pre-trial detainees "need only show that

prison conditions are objectively unreasonable in order to state a claim under the due process clause." *Id.* This test also applies to immigrant detainees. *C.G.B.*, 464 F. Supp. 3d at 211 n.31 ("The Court is persuaded, both by the language of *Kingsley* and by its fellow courts, to apply the *Kingsley* standard here as well. Accordingly, [p]laintiffs need not prove deliberate indifference."). Defendants thus violate Plaintiffs' due process rights under the Fifth Amendment when they "knew or should have known that the [detention] conditions posed an excessive risk to their health and intentionally or recklessly failed to act." *Banks*, 468 F. Supp. 3d at 111.

Defendants' failure to provide COVID-19 vaccine booster shots to Plaintiffs violates their Fifth Amendment substantive due process rights. Defendants knew or should have known that their failure to provide booster shots constitutes an unreasonable risk to Plaintiffs' health, and nevertheless failed to provide them. Defendants recklessly disregarded Plaintiffs' serious medical need for a COVID-19 vaccine booster shot.

> **a.  Defendants' Failure to Provide COVID-19 Vaccine Booster Shots Poses an Unreasonable Risk to Plaintiffs' Health.**

Defendants' failure to provide COVID-19 booster shots constitutes an unreasonable risk to Plaintiffs' health. "Determining whether or not [p]laintiffs have been exposed to an unreasonable risk is an objective analysis which 'requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk.'" *Banks*, 468 F. Supp. 3d at 111 (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)) (emphasis in original)). "In other words, the [detainee] must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling*, 509 U.S. at 36. Defendants may not impose conditions that pose an unreasonable risk of future harm, even if that harm has not yet come to pass. "It would

be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition

in their prison on the ground that nothing yet had happened to them." *Id*. at 33.

Defendants' failure to provide booster shots exemplifies this unreasonable risk. As

numerous courts have concluded, failure to provide adequate protection against COVID-19 in

jail or detention poses an unreasonable risk to the health of detainees. *See, e.g.*, *Banks*, 468 F.

Supp. 3d at 111; *Ferreyra v. Decker*, 456 F. Supp. 3d 538, 550 (S.D.N.Y. 2020) ("Petitioners

have established . . . that Respondents [(including ICE)] have left in place conditions of

confinement that result in COVID-19 posing an unreasonable risk of serious damage to their

health."); *Malam v. Adducci*, 455 F. Supp. 3d 384, 395 (E.D. Mich. 2020) (same); *Zepeda Rivas*

*v. Jennings*, 445 F. Supp.3d 36, 40 (N.D. Cal. 2020) (same). This is true even if Defendants have

been taking other mitigation measures to reduce the risk of spread of COVID-19. First, the

evidence from multiple COVID-19 lawsuits targeting ICE detention facilities across the country,

as well as Plaintiffs' declarations, demonstrate that any mitigation measures Defendants have

implemented are falling short of preventing spread of the virus in detention facilities. Second,

even if Defendants' mitigation measures were working, Plaintiffs are still subject to a heightened

and unreasonable risk of serious illness or death from COVID-19 without booster shots because

of their medical vulnerabilities and by the very fact of their detention in congregate settings.

Mitigation measures to reduce the spread of COVID-19 are therefore not replacements for

booster shots in constitutional, or practical and medical, senses.

As discussed above, it is well-established that the primary vaccination doses alone, absent

a booster shot, provide inadequate protection against COVID-19 because the immunity provided

by the initial vaccine doses wanes over time. Vijayan Decl. ¶¶ 21–24; Feigl-Ding Decl. ¶¶ 24-27.

Defendants' failure to offer booster shots to Plaintiffs "prevent[s] Plaintiffs from being able to

take the preventative and precautionary steps that the larger, non-detained population has been able to take to slow the spread of COVID-19." *Banks*, 468 F. Supp. 3d at 112. Moreover, booster shots are even more critical in light the recent surge in COVID-19 cases caused by the highly infectious Omicron variant and its subvariants. Vijayan Decl. ¶¶ 24–25, Feigl-Ding Decl. ¶¶ 28-29, 31-35; Amazan Decl. Ex. P (Letter from Dr. Allen and Dr. Rich); Amazan Decl. Ex. O (Letter from Concerned Medical Faculty). As a result, Defendants' failure to provide COVID-19 vaccine booster shots to Plaintiffs constitutes an unreasonable risk to Plaintiffs' health.

> **b. Plaintiffs Have a "Serious Medical Need" for a COVID-19 Vaccine Booster Shot.**

Given that COVID-19 vaccine booster shots are necessary to protect the health and safety of Plaintiffs and prevent serious illness or death from COVID-19, Plaintiffs have a serious medical need for a COVID-19 vaccine booster shot.

"A medical need is serious if it either is diagnosed by a physician as mandating treatment or is so obvious that a lay person easily would recognize the necessity of a physician's attention." *Coleman-Bey v. United States*, 512 F. Supp. 2d 44, 47 (D.D.C. 2007). Furthermore, "[w]here denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious." *Oladokun v. Corr. Treatment Facility*, 5 F. Supp. 3d 7, 15 n.9 (D.D.C. 2013). The well-known risks of serious illness, including hospitalization and death, from COVID-19 for medically vulnerable individuals "easily push [Plaintiffs'] claim into the category of serious medical needs." *Brown v. D.C.*, 514 F.3d 1279, 1284 (D.C. Cir. 2008).

Numerous courts have concluded that vulnerability to COVID-19 constitutes a "serious medical need." *Coronel v. Decker*, 449 F. Supp. 3d 274, 283 (S.D.N.Y. 2020) (concluding that immigrant detainees with medical vulnerabilities "have a serious medical need . . . to avoid contracting [COVID-19] and thereby potentially suffering 'death, degeneration, or extreme

pain.'"); *accord Coreas v. Bounds*, 451 F. Supp. 3d 407, 426 (D. Md. 2020); *Gayle v. Meade*, No. 20-21553-CIV, 2020 WL 3041326, at *18 (S.D. Fla. June 6, 2020), *reconsideration denied*, No. 20-21553-CIV, 2021 WL 1255627 (S.D. Fla. Mar. 24, 2021). Moreover, courts have determined that "the COVID-19 vaccine is a 'serious medical need'" for people in custody. *Maney v. Brown*, No. 6:20-CV-00570-SB, 2021 WL 354384, at *11 (D. Or. Feb. 2, 2021); *see also Patel v. Cnty. of Orange*, No. 817CV01954JLSDFM, 2019 WL 4238875, at *6 (C.D. Cal. June 19, 2019) (concluding, based on the Supreme Court's holding in *Helling*, that "the exposure to the risk of contracting hepatitis is enough to state an Eighth Amendment claim" that "the need for vaccines to *prevent* the contraction of hepatitis logically is a 'serious' medical need").

### c. Defendants Knew or Should Have Known That Their Failure to Provide COVID-19 Vaccine Booster Shots Posed an Excessive Risk to Plaintiffs' Health, and Recklessly Failed to Act.

Defendants knew or should have known that failure to provide COVID-19 vaccine boosters posed an excessive risk to Plaintiffs' health. As explained above, to succeed on the merits of their Fifth Amendment due process claim, pre-trial detainees need only "show[] that the Defendants knew or should have known that the jail conditions posed an excessive risk to their health and intentionally or recklessly failed to act." *Banks*, 468 F. Supp. 3d at 111; *see also Miranda v. Cnty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) (concluding that "medical-care claims brought by pretrial detainees . . . are subject only to the objective unreasonableness inquiry identified in *Kingsley*"); *Brawner v. Scott Cty., Tennessee*, 14 F.4th 585, 596 (6th Cir. 2021) (same); *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1120, 1122–25 (9th Cir. 2018) (same); *Darnell v. Piniero*, 849 F.3d 17, 34–35 (2d. Cir. 2017); *but see Strain v. Regalado*, 977 F.3d 984, 991 (10th Cir. 2020); *Whitley v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018); *Dang by*

*& through Dang v. Sheriff, Seminole Cnty.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017); *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 419 n.4 (5th Cir. 2017).

Defendants have recklessly failed to provide COVID-19 booster shots to Plaintiffs.[41] They knew or should have known, based on the recurrent public recommendations discussed above, that COVID-19 booster shots are necessary to provide Plaintiffs adequate protection against COVID-19. *See supra* § I.A, II.C.1. These public announcements, made repeatedly by the CDC and the federal government over the past several months, are sufficient to establish that Defendants knew or should have known that the failure to provide COVID-19 vaccine booster shots poses an excessive risk to Plaintiffs' health. *See, e.g.*, *Farmer*, 511 U.S. at 826 ("[A] factfinder may conclude that the official knew of a substantial risk from the very fact that it was obvious."). By failing to provide booster shots to people in ICE detention, Defendants "have disregarded those risks by failing to take comprehensive, timely, and proper steps to stem the spread of the virus." *Banks*, 468 F. Supp. 3d at 119.

---

[41] Because "[t]he civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known," *Farmer*, 511 U.S. at 836, "to establish that conditions of confinement violate due process, a [pre-trial detainee] need establish only that detaining officials know or should know that those conditions objectively constitute a serious risk to the defendant's health," *United States v. Otunyo*, No. CR 18-251 (BAH), 2020 WL 2065041, at *13 (D.D.C. Apr. 28, 2020).

**d.  While Plaintiffs Need Only Show that Defendants Recklessly Failed to Act under *Kingsley*, Defendants Also Had Subjective Knowledge of The Risk to Plaintiffs.**

Because Plaintiffs are civil immigrant detainees, they are not required to establish that Defendants acted with deliberate indifference, a subjective intent or awareness of the risk of harm posed to Plaintiffs by their failure to act, as is required for Eighth Amendment claims brought by convicted prisoners. *See Kingsley*, 576 U.S. at 397; *see also Banks*, 468 F. Supp. 3d at 110–11; *C.G.B.*, 464 F. Supp. 3d at 211 n.31.

However, even if Plaintiffs were required to demonstrate that Defendants had subjective awareness of the risk posed by their failure to act, Defendants clearly were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and "dr[ew] the inference." *Farmer*, 511 U.S. at 837. Plaintiffs are not required to "show that [Defendants] acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id*. at 842.

Defendants have acknowledged the threat of COVID-19 in their own policy documents,[42] and is aware of over 5,200 medically vulnerable detainees in custody whom they have declined to release after administrative review of their files, including Plaintiffs.[43] *See supra* § I.C.1. In addition, as noted above, the ACLU sent Defendants a letter in December 2021 regarding the importance of booster shots to detainees, as did DHS's own medical experts in January 2022.[44] Recently, five medically vulnerable detained immigrants sued Defendants ICE and DHS over the

---

[42] ICE, *ICE ERO COVID-19 Pandemic Response Requirements (Version 7.0)*, *supra* note 22 at 6–7.

[43] *Fraihat*, 445 F. Supp. 3d at 751, *supra* note 24; Galvez-Montoya, *Coronavirus Infections inside U.S. Detention Surge by 520 Percent in 2022*, *supra* note 8.

[44] Letter from ACLU to Sec. Alejandro Mayorkas, COVID-19 Vaccine Booster Availability in ICE Detention Facilities (Dec. 15, 2021), *supra* note 28; Letter from Dr. Scott Allen and Josiah Rich (Jan. 26, 2022), *supra* note 29.

failure to provide them with COVID-19 booster shots, directly prompting ICE to administer boosters to those five individuals.[45] As a result, Defendants' subjective awareness of the substantial risk of harm that Plaintiffs would face without a COVID-19 booster shot, and their failure to act demonstrate Defendants' deliberate indifference.

### 2. Defendants' Failure to Provide COVID-19 Boosters Constitutes Punishment in Violation of Plaintiffs' Fifth Amendment Substantive Due Process Rights.

Because Plaintiffs are civil immigration detainees, they cannot be subject to conditions that constitute punishment. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Defendants' failure to provide COVID-19 booster shots to Plaintiffs constitutes unlawful punishment and violates Plaintiffs' due process rights because their inaction is not "rationally related to a legitimate nonpunitive government purpose or . . . appear[s] excessive in relation to that purpose." *C.G.B.*, 464 F. Supp. 3d at 211 (quoting *Kingsley*, 576 U.S. at 398); *see also S. Poverty Law Ctr. v. U.S. Dep't of Homeland Sec.*, 2020 WL 3265533, *18 (D.D.C. June 17, 2020) (considering whether the contested condition "is objectively unreasonable or excessive relative to the Government's proffered justification.").

As medically vulnerable individuals, Plaintiffs are at risk of serious illness or death if they contract COVID-19, which is highly likely to occur in ICE detention. Vijayan Decl. ¶¶ 7, 15–17. ICE's failure to provide a COVID-19 vaccine booster shot exposes Plaintiffs to the avoidable risks of hospitalization and death from COVID-19, and lacks any relation to any legitimate interest held by the government. As an initial matter, Defendants' responsibility to provide detainees "with medical care ordinarily does not conflict with competing administrative concerns." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (citing *Whitley v. Albers*, 475 U.S. 312,

---

[45] *See Shaikh v. U.S. Immigr. & Customs Enf't*, No. 1:22-cv-00231 (D.D.C. Feb. 24, 2022), Dkt. 23.

320 (1986)). Failure to provide a vaccine booster shot to detained immigrants, moreover, is not rationally related to either of the government's interests in ensuring appearance at future immigration proceedings or preventing danger to the community. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Moreover, providing COVID-19 vaccine booster shots to people in immigration detention does not in any way impede those goals. In fact, Defendants' failure to provide booster shots may even run counter to their interests, as quarantine protocols due to infection or facility outbreaks have precluded detained immigrants from appearance in court proceedings.[46]

Nor can Defendants argue that their failure to provide Plaintiffs with vaccine booster shots is justified by an interest in saving costs. It is well-established that budgetary interests cannot justify denial of care for a detainee's serious medical needs. *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) ("Lack of resources is not a defense to a claim" for lack of medical care) (en banc) (citations omitted); *Wright v. Rushen*, 642 F.2d 1129, 1134 (9th Cir. 1981) ("[C]osts cannot be permitted to stand in the way of eliminating conditions below Eighth Amendment standards."); *Koselik v. Maloney*, 221 F. Supp. 2d 156, 161 (D. Mass. 2002) ("It is not, however, permissible to deny an inmate adequate medical care because it is costly."). As discussed in detail above, it is beyond dispute that protection from COVID-19, particularly for medically vulnerable individuals, constitutes a "serious medical need." *See, e.g.*, *Banks*, 459 F. Supp. 3d at 155 (noting lack of dispute regarding the threat of COVID-19 to the health of people in detention); *see also supra* § III.A.1.b.

---

[46] Amazan Decl., Ex. FF, Marissa Armas, *'Putting Our Lives At Risk': Detainees at Aurora Facility Claim COVID Prolongs Stay*, CBS4 NEWS (Jan. 20, 2022), https://denver.cbslocal.com/2022/01/20/covid-aurora-ice-detention-facility/; Amazan Decl., Ex. GG, Sofia Mejias-Pascoe, *COVID-19 Cases at San Diego Detention Center Reach All-Time High*, INEWSOURCE (Jan. 18, 2022), https://inewsource.org/2022/01/18/covid-19-cases-san-diegos-ice-detention-center.

Defendants' failure to provide COVID-19 booster doses to detained immigrants, such as Plaintiffs, is also unreasonable in light of the policies and programs established by other custodial entities, such as the BOP and state departments of correction, to provide booster shots to prisoners. Where civil detainees, such as Plaintiffs, face conditions that are "not more considerate than those at pretrial and prison facilities," such conditions "may be punitive in nature and may therefore violate the substantive due process clause." *S. Poverty Law Ctr.*, 2020 WL 3265533, at *19 (quoting *Torres v. United States Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1065 (C.D. Cal. 2019)); *Jones v. Blanas*, 393 F.3d 918, 934 (9th Cir. 2004) ("[A] presumption of punitive conditions arises where the individual is detained under conditions identical to, similar to, or more restrictive than those under which pretrial criminal detainees are held."). Unlike ICE's PRR, the BOP's October 2021 COVID-19 Vaccine guidance instructed its facilities nationwide to provide booster doses to eligible prisoners.[47] The District of Columbia Department of Corrections issued similar guidance in December 2021, noting that it "continues to offer a COVID-19 vaccine to all residents who are eligible."[48] State departments of correction have likewise issued similar guidance, and have reported provision of booster shots to thousands of incarcerated individuals.[49] Defendants' failure to provide booster shots, in light of conditions in prisons, is therefore unconstitutionally punitive, in violation of Plaintiffs' due process rights.

**B.  The Remaining Factors Weigh Heavily in Plaintiffs' Favor.**

**1.  The Denial of Readily Available Protection from a Lethal Virus Constitutes**

---

[47] Fed. Bureau of Prisons, *COVID-19 Vaccine Guidance*, Version 14.1, 5–6, *supra* note 32.

[48] Gov't of the Dist. of Columbia, *Coronavirus Prevention*, *supra* note 33.

[49] Delaware Dep't of Corr., *Active COVID-19 Cases (Offenders)*, *supra* note 34 (noting that "1,593 vaccinated inmates have received a booster"); Missouri Dep't of Corr., *COVID-19 Data*, *supra* note 34 (boosters administered to 4,158 inmates); Minnesota Dep't of Corr., *COVID-19 Data*, *supra* note 34 (33 percent of incarcerated population fully vaccinated and boosted); Michigan.gov, *COVID-19 Dashboard*, *supra* note 35 (boosters administered to 11,398 incarcerated individuals).

**Irreparable Harm.**

A temporary restraining order or preliminary injunction "requires only a likelihood of irreparable injury." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016) (citing *Winter,* 555 U.S. at 22), and while the harm must be "imminent," that means only that there must be "a clear and present need for equitable relief to prevent irreparable harm." *Id.* at 8. (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). The harm also "must be beyond remediation." *Id.* (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297).

This district has already concluded that an individual's "risk of contracting COVID-19 and the resulting complications, including the possibility of death, is the prototypical irreparable harm." *Banks*, 459 F. Supp. 3d at 159 (citing *Harris v. Bd. of Supervisors, Los Angeles Cnty.*, 366 F.3d 754, 766 (9th Cir. 2004)). Indeed, courts in this district have "often [found] a showing of irreparable harm where the movant's health is in imminent danger." *Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 20 (D.D.C. 2005) (citation omitted) (granting preliminary injunction where government was allegedly denying medical treatment to Guantanamo detainees and "the threat of death or serious physical deterioration [was] real and imminent"); *Wilson v. Group Hosp. & Med. Servs., Inc.*, 791 F. Supp. 309, 314 (D.D.C. 1992) (granting preliminary injunction where cancer patient's "health and future remain[ed] in serious doubt"); *see also, e.g.*, *Banks*, 459 F. Supp. 3d at 159 (granting preliminary injunction where incarcerated plaintiffs "produced expert evidence that they are 'at a significantly higher risk of infection with COVID-19 as compared to the population in the community' and 'at a significantly higher risk of harm if they do become infected'").

Here, Plaintiffs have submitted evidence describing their medical vulnerability to COVID-19, the danger they face from Defendants' failure to provide them with COVID-19 vaccine booster shots, and their desire for protection via vaccine booster shot. *See* Escalante Decl. ¶¶ 6–8; Hernandez Herrera Decl. ¶¶ 7–10; Sorokin Decl. ¶¶ 7–10; Dominguez Gonzalez Decl. ¶¶ 7–8.; *see also* Vijayan Decl ¶¶ 19–20, 27. According to ICE's own data, 1,001 people in ICE detention facilities as of February 28, 2022 are currently positive for COVID-19, compromising over five percent of all detainees in custody.[50] Individuals held in ICE detention are also more likely to contract COVID-19 than in the surrounding community. Certain mitigation measures to reduce the spread of COVID-19 that Defendants may have been taking have proven inadequate to sufficiently shield Plaintiffs from the risk of contracting COVID-19 while in detention. As a recent study has shown, COVID-19 case rates in ICE detention were, on average at least 5.3 times higher than in the state-matched U.S. population.[51] ICE detainees report other detainees who have recently contracted COVID-19 in their detention facilities, including individuals who requested but were denied booster shots and subsequently fell ill with COVID-19. *See* Sorokin Decl. ¶ 8; Dominguez Gonzalez Decl. ¶ 7. As noted above, without the requested relief, Plaintiffs are approximately three and a half times more likely to be hospitalized and four times more likely to die from COVID-19 because of ICE's failure to provide them COVID-19 booster shots. Feigl-Ding Decl. ¶ 26. Such injuries are also indisputably "beyond remediation" because the harms from unlawful conditions of detention "cannot be remedied after the fact." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (citations omitted).

**2.  The Balance of Equities and Public Interest Weigh Heavily in Plaintiffs' Favor.**

---

[50] ICE, *ICE Guidance on COVID-19: Detainee Statistics*, *supra* note 2.

[51] Nishant Uppal, Elizabeth Chin, and Parsa Erfani, *Trends in Decarceration, COVID-19 Cases, and SARS-CoV-2 Testing in U.S. Immigration Detention Centers from September 2020 to August 2021*, *supra* note 11.

The final two factors—balance of the equities and the public interest—merge in this case, as Defendants are government actors. *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). These factors also favor Plaintiffs. As discussed above, Plaintiffs have established a likelihood that they will prevail on the merits of their due process claims, and "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Banks*, 459 F. Supp. 3d at 160 (citing *Simms v. Dist. of Columbia*, 872 F. Supp. 3d 90, 105 (D.D.C. 2012)). In other words, "[t]here is no harm to the Government when a court prevents unlawful practices." *Id.*; *see also R.I.L-R*, 80 F. Supp. 3d at 191.

Moreover, "granting injunctive relief which lessens the risk that Plaintiffs will contract COVID-19 is in the public interest because it supports public health." *Banks*, 459 F. Supp. 3d at 160. As the *Banks* court aptly described, "[n]o man's health is an island." *Id*. Booster shots promote public health by reducing the risk of COVID-19 to Plaintiffs and others detained in the facilities, which also minimizes transmission risk to staff members and local communities. Vijayan Decl. ¶¶ 17–18; Feigl-Ding Decl. ¶¶ 8, 24, 35. New variants of COVID-19, including the Omicron subvariant BA.2, have and will inevitably continue to arise. Feigl-Ding Decl. ¶¶ 7, 21–23; 31–33; Vijayan Decl. ¶ 13. At a time when community resources are still limited and the overall healthcare infrastructure heavily strained, it would also benefit the public to prevent Plaintiffs from suffering serious COVID-19 complications which may require hospitalization. Vijayan Decl. ¶¶ 10–12, 17, 27. Thus, ordering Defendants to take the basic precaution of providing COVID-19 vaccine booster shots to protect Plaintiffs from risk of infection and serious illness also benefits the public. *Banks*, 459 F. Supp. 3d at 160.

Lastly, the modest requested relief does not impose an undue burden on Defendants. COVID-19 vaccine booster shots, including mRNA vaccine booster shots, are widely available

to the U.S. public. Defendants, as federal government agencies, should have unparalleled immediate access to these vaccines.[52] Vijayan Decl. ¶ 25; Feigl-Ding Decl. ¶ 25. When endorsing the clinical preference for mRNA vaccines, the CDC noted that "[t]he U.S. supply of mRNA vaccines is abundant – with nearly 100 million doses in the field for immediate use."[53] Vijayan Decl. ¶ 25. This Court would not be ordering Defendants to provide any protection that has not already been made available to the broader, non-detained public. Further, by undertaking this simple task of providing booster shots, Defendants will benefit in the long run with fewer detainees becoming infected and becoming very sick from COVID-19, thereby freeing up healthcare and staffing resources. *Id.* ¶ 17.

In light of the grave and irreparable harm Plaintiffs face, ordering Defendants to merely comply with the CDC's recommendations and provide COVID-19 booster shots to Plaintiffs is not only appropriate but imperative.

## IV.  CONCLUSION

For the aforementioned reasons, Plaintiffs respectfully request that this Court issue a temporary restraining order directing Defendants to make available and provide each of them with an mRNA COVID-19 vaccine booster shot by a qualified medical professional, along with adequate education, pre-vaccination consultation, and documentation in accordance with the CDC's guidance on COVID-19 vaccine booster shots.

---

[52] Amazan Decl. Ex. HH, Tom Randall, Cedric Sam, et al., *More Than 10.7 Billion Shots Given: COVID-19 Tracker*, BLOOMBERG https://www.bloomberg.com/graphics/covid-vaccine-tracker-global-distribution/ (updated Feb. 28, 2022) (noting "93.5 million have received boosters," states have 11 to 34 percent of vaccine supply unused, and "[t]he U.S. has pledged to send 1.1 billion doses to other hard-hit regions of the world . . . .").

[53] Amazan Decl. Ex. II, CDC, *CDC Endorses ACIP's Updated COVID-19 Vaccine Recommendations* (Dec. 16, 2021), https://www.cdc.gov/media/releases/2021/s1216-covid-19-vaccines.html#.

Dated:March 1, 2022

Respectfully submitted,

/s/ Eunice H. Cho
Eunice H. Cho†
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth St. NW, 7th Floor
Washington, DC 20005
(202) 548-6616
echo@aclu.org

Michael Tan*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
Aditi Shah*
NATIONAL PRISON PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2600
mtan@aclu.org
ashah@aclu.org

/s/ Arthur B. Spitzer
Arthur B. Spitzer (D.C. Bar No. 235960)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
OF THE DISTRICT OF COLUMBIA
915 Fifteenth St. NW, 2nd Floor
Washington, DC 20005
(202) 601-4266
aspitzer@acludc.org

My Khanh Ngo*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
(415) 343-0764
mngo@aclu.org

*application for admission *pro hac vice*
forthcoming
†*Pro hac vice* application forthcoming; bar
application pending in DC; practice limited to
federal courts

*Counsel for Plaintiffs*