# UNITED STATES DISTRICT COURT

# DISTRICT OF COLUMBIA

| | |
|---|---|
| **Miguel Angel ESCALANTE, *et al.*,** ) | |
| ) | |
| *Plaintiffs*, ) | **Case No. 1:22CV541 RJL** |
| ) | |
| v. ) | |
| ) | |
| **U.S. IMMIGRATION AND CUSTOMS** ) | |
| **ENFORCEMENT, *et al.*,** ) | |
| ) | |
| *Defendants.* ) | |
| _____ ) | |

## DEFENDANTS' MEMORANDUM IN RESPONSE TO PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER

### I. Introduction and Factual Background

The named Plaintiffs in this matter are four immigration detainees being held by U.S. Immigration and Customs Enforcement ("ICE") in four different detention facilities in three different states.  As set forth in Plaintiffs' Complaint, all four have received and completed their initial COVID-19 vaccinations.  Dkt. 1, ¶¶ 28, 30, 32, 35.  In their Application for Temporary Restraining Order ("TRO") of March 1, 2022, Plaintiffs request that this Court enter an order requiring Defendants ". . . to immediately make available and provide them with mRNA COVID-19 vaccine booster shots by a qualified medical professional, along with adequate education, pre-vaccination consultation, and documentation in accordance with the Centers for Disease Control and Prevention's ("CDC") guidance on COVID-19 vaccine booster shots."  Dkt. 2 at p.1.   In the accompanying Complaint, all four allege violations of their Fifth Amendment Rights (due process, confinement amounting to punishment), and three Plaintiffs (Escalante,

1

Hernandez Herrera, and Sorokin) allege violations of the Administrative Procedure Act ("APA") and Rehabilitation Act (failure to provide reasonable accommodation to persons with disabilities).  Dkt. 1, pp. 22-26.  The basis of their request for a TRO is, however, based solely on alleged Fifth Amendment violations.  Dkt. 2, p. 20.

All of Plaintiffs' claims concern allegations about COVID-19 booster policies and procedures at the detention centers where they are housed.  Plaintiffs' motion for a TRO should not be granted because their claims have been rendered moot through the administration of a COVID-19 booster vaccination to three plaintiffs (Escalante and Sorokin received mRNA boosters, Hernandez Herrera received a Johnson & Johnson ("Janssen") booster and is not medically eligible for an mRNA booster at this time), and Plaintiff Gonzalez's refusal of a Janssen booster prior to this action, and subsequent refusal of a Pfizer mRNA booster.  *See* Declarations of Floyd Craig, III (Craig. Decl) attached as Exhibit 1, Judith Almodovar (Almodovar Decl.) attached as Exhibit 2, Christopher McGregor (McGregor Decl.) attached as Exhibit 3, and Joseph Suazo, Jr. (Suazo Decl.) attached as Exhibit 4.  Furthermore, Plaintiffs' claims should otherwise be transferred to the correct venue, either the places of their detention or to the Central District of California where they are all *Fraihat* class members.  For these reasons, and as further argued below, Plaintiffs cannot demonstrate a likelihood of success on the merits and cannot meet the remaining standards for entry of a TRO.  Their motion for TRO should, therefore, be denied.

## II.  Argument

A.   <u>TRO Heightened Standard of Review Where Plaintiffs Seek Action, Not Status Quo</u>

A TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief."  *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008).  The standard for obtaining a TRO is identical to that for obtaining a preliminary injunction.  *Hall v. Johnson,* 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009).  To be entitled to a temporary restraining order (or a preliminary injunction), a plaintiff must demonstrate that (1) there is a substantial likelihood of ultimate success on the merits; (2) a restraining order or injunction is necessary to prevent irreparable injury; (3) the threatened injury outweighs the harm that the restraining order or injunction would inflict on the other party; and (4) the restraining order or injunction would not be adverse to the public interest. *AAmer v. Obama,* 742 F.3d 1023, 1038 (D.C. Cir. 2014).  When seeking this remedy, "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014).  Where the Government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Where a motion seeks a "mandatory injunction," as Plaintiffs do here, to force the government to act, rather than simply maintain the status quo, the motion is adjudicated under a heightened standard*.  See Strait Shipbrokers Pte. Ltd., v. Blinken*, 2021 U.S. Dist. LEXIS 152112, *18-19 (D.D.C. August 12, 2021)*.  "Indeed, as a rule, when a mandatory preliminary injunction is requested, the district court should deny such relief unless the facts and law clearly favor the moving party.'" *Id*. (internal quotation marks and citation omitted).

As set forth below, Plaintiffs cannot show a likelihood of success on the merits, much less the heightened standard that the facts and law are "clearly in favor of the moving party."

B.    Plaintiffs Cannot Demonstrate the Facts and Law are Clearly in Their Favor

The TRO Plaintiffs cannot demonstrate that the facts and law are "clearly in their favor," or even that they have a substantial likelihood of success on the merits, because their claims are moot.  The relief that Plaintiffs request in their TRO motion is education, pre-vaccination consultation, documentation in accordance with CDC standards,[1] and the immediate administration of mRNA booster vaccinations to each plaintiff.  Dkt. 2, p. 34.

1.    Plaintiffs Escalante, Hernandez Herrera, and Sorokin's Claims Are Moot Because They Have Received Boosters, and Gonzalez Rejected Vaccination Booster

Two of the four Plaintiffs, Escalante and Sorokin, have received their mRNA booster vaccinations since the filing of this action.  *See* Decls. of Craig at ¶ 8,  Almodovar at ¶ 38.    Their claims are, therefore, moot.   "In general, a case becomes moot where the activities for which an injunction is sought have already occurred and cannot be undone." *Monzillo v. Biller*, 735 F.2d 1456, 1459 (D.C. Cir. 1984).  Similarly, Plaintiff Hernandez Herrera received a Janssen[2] booster vaccination on March 1, 2022.   *See* Decl. of McGregor, ¶ 8.   Because he received a booster vaccination, he is ineligible under current CDC       guidance       for       a       subsequent       mRNA       booster.             *See*

---

[1] There is no legal or factual support provided by Plaintiffs in their filings for claims that failure by Defendants to provide education, consultation, and/or documentation as requested would constitute immediate and irreparable harm to Plaintiffs such that a TRO should be granted for those requests.

[2] Janssen booster vaccinations are appropriate in certain circumstances, such as where the individual would otherwise not be vaccinated due to limited access to mRNA vaccines. *See* https://www.cdc.gov/coronavirus/2019/ncov/vaccines/different-vaccines/janssen.html.

www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/booster-shots-and-third-doses-for-covid19-vaccines-what-you-need-to-know (explaining CDC guidance that those who need a fourth shot (in addition to a booster) as those with conditions such as HIV with a high viral load, active cancer treatment, etc.).    His TRO claim is, therefore, moot because there Court cannot afford him the relief he seeks. *See Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013) (A case is moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.") (internal quote and citation omitted).   Finally, Plaintiff Gonzalez rejected the two booster vaccinations offered to him, including a Pfizer mRNA booster offered after the filing of this action. *See* Decl. of Suazo, ¶¶ 13-14.   A self-inflicted injury is insufficient to constitute irreparable harm. *See, e.g., Second City Music, Inc. v. City of Chicago, Ill.,* 333 F.3d 846, 850 (7th Cir. 2003) ("Injury caused by failure to secure a readily available license is self-inflicted, and self-inflicted wounds are not irreparable injury. Only the injury inflicted by one's adversary counts for this purpose"); *Salt Lake Tribune Pub. Co., LLC v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003) (holding that courts will not consider a self-inflicted harm to be irreparable); *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995) (same).   Here, any remaining injury suffered by Gonzalez is self-inflicted because he refused the very relief that this TRO requests.   His TRO claim is therefore moot because Gonzalez received the remedy he sought, but refused it.

As Plaintiffs' claims all are moot, they cannot prevail on the merits, and their motion for TRO should be denied.

_____

2. <u>The Court Should Sever and Transfer Plaintiffs' Claims to the Jurisdictions of their Detention</u>

Should this Court look beyond Plaintiffs' inability to demonstrate that the facts and law are clearly in their favor due to the mootness of the TRO Plaintiffs' claims, Plaintiffs also cannot show that the facts and law are clearly in their favor because their claims are subject to severance and transfer.  Plaintiffs allege that venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because "Defendants are agencies of the United States," and that "Defendants have failed at the headquarters level to direct all ICE detention facilities to ensure that all eligible people in Defendants' custody are able to obtain mRNA COVID-19 booster shots."  Dkt. 1 ¶ 10.  But as discussed below, Plaintiffs' attempt to challenge the acts or omissions of ICE headquarters officials is misplaced because there is ICE headquarters' guidance regarding COVID-19 booster shots.  *See* Rivera Decl. at ¶¶ 5-6, 11, 14-17.  Rather, if the Court does not agree that the named Plaintiffs' claims are moot, then the allegations raised by Plaintiffs correspond with actions and alleged omissions occurring at four immigration detention facilities in three different states, all outside this district.  Dkt. 1 ¶¶ 11-15, 26-35.

Two statutes may govern a motion to transfer a case based on venue. First, where venue is improper, a court must dismiss or transfer under 28 U.S.C. § 1406. Second, for the convenience of parties and witnesses, and in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought, pursuant to 28 U.S.C. § 1404.  The party moving to transfer venue bears the burden of establishing that convenience and the interests of justice weight in favor of transfer. *Int'l Bhd. of Painters & Allied Trades Union v. Best Painting and Sandblasting Co., Inc.*, 621 F. Supp. 906, 907 (D.D.C. 1985).

In this case, Plaintiffs rely on 28 U.S.C. § 1391(e) to confer venue on this Court. Section 1391(e) specifies that such an action may "be brought in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1). This provision thus vests "discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)). Courts in this district in particular "must examine challenges to personal jurisdiction and venue carefully to guard against the danger that a plaintiff might manufacture venue in the District of Columbia." *Cameron v. Thornburgh*, 983 F.2d 253, 256 (D.C. Cir. 1993). It is well established that "the location of the agency's headquarters office [in the District of Columbia] does not automatically establish venue in this district." *Bell v. United States*, Civ. A. NO. 18-0738, 2019 WL 1427246, at *2 (D.D.C. Mar. 29, 2019) (citing *Bartel v. Federal Aviation Admin*., 617 F. Supp. 190, 199 (D.D.C. 1985)); *Pearson v. Rodriguez*, 174 F. Supp 3d 210, 213-14 (D.D.C. 2016); *Aftab v. Gonzalez*, 597 F. Supp. 2d 76, 81 (D.D.C 2009) (Holding that when the only connection to the District of Columbia "is that a federal agency is headquartered here is charged with generally regulation and overseeing the [administrative] process," venue is not appropriate in the District of Columbia.)

A threshold question is whether the case could have been brought in the district to which transfer is sought. *Stewart Org. v. Ricoh Corp*., 487 U.S. 22, 29 (1988) (citations omitted). If a court determines that the case could have been brought in the district to

which transfer is sought, that court should next determine whether the case should be transferred by weighing private and public interests regarding transfer.  *See, e.g., Bederson v. United States*, 756 F. Supp. 2d 38, 46 (D.D.C. 2010).  Defendants aver that jurisdiction of these claims should be transferred to the federal districts where Plaintiffs are currently detained.

The named Plaintiffs are detained in four different correctional facilities in three different states, and thus have not established residence in the District of Columbia. Furthermore, other than unsupported allegations regarding the lack of an ICE headquarters policy that actually exists, Plaintiffs have provided no evidence or facts to show a "substantial part of the events or omissions giving rise to the claim occurred" within the District of Columbia.  Dkt 1, ¶¶ 8-10.  Thus, this Court should find that it would have been reasonable to bring Plaintiffs' claims before their local federal jurisdictions, and as such, should weight the public and private interests to find transfer of venue is warranted.

This Court has held that public and private interests should be taken into consideration when adjudicating a transfer or severance of claims. The private interest factors to be taken into consideration include: "(1) the plaintiffs' choice of forum; (2) the defendants' preferred forum; (3) the location where the claim arose; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the ease of access to sources of proof." *Vasser v. McDonald*, 72 F. Supp. 3d 269, 282 (D.D.C. 2014). The balance of these factors weighs in favor of a transfer in this case. "Although the 'plaintiff's choice of forum is ordinarily entitled to deference,' that choice is conferred considerably less deference when it is not the plaintiff's home forum, has few factual ties to the case at hand, and defendants seek to transfer to plaintiff's" governing jurisdiction. *Nat'l Ass'n of Home*

*Builders v. U.S. Envt'l Prot. Agency,* 675 F.Supp.2d 173, 179–80 (D.D.C. 2009); *see also New Hope Power Co. v. U.S. Army Corps of Engineers*, 724 F.Supp.2d 90, 96 (D.D.C. 2010) ("Because the plaintiffs did not bring this claim in their home forum, this case lacks meaningful ties to the District of Columbia, and defendants seek transfer to the plaintiffs' home forum, the plaintiffs' choice of forum will be accorded little deference and the choice of forum factors favor transfer."); *Trout Unlimited v. U.S. Dep't of Agric.*, 944 F.Supp. 13, 17 (D.D.C. 1996) (same). So, while the Court may give weight to the Plaintiffs' choice of forum, that choice is not determinative, especially where, as here, Plaintiffs do not reside in the chosen jurisdiction and the venue chosen lacks an adequate nexus to the events of the case. *See Piper Aircraft co., v. Reyno*, 454 U.S. 235, 255-56 (1981); *Shawnee Tribe v. United States*, 298 F. Supp. 2d 21, 24 (D.D.C. 2002).

Nor does Plaintiffs' Complaint or TRO Application allege that any relevant factual events occurred within this district. Dkt, ¶¶ 19-71. Any alleged failure to adhere to the COVID-19 policies or precautions would be committed by officials and facilities where plaintiffs are detained during the pendency of their removal actions. *See* Rivera Decl. at ¶¶ 5-6. "Cases challenging the actions of local USCIS offices," or in this case facilities, "are frequently, and appropriately, transferred to the venue encompassing those local offices for this reason." *Bourdon v. U.S. Dept. of Homeland Sec.*, 235 F. Supp. 298, 305 (D.D.C. 2017); *see also Aftab v. Gonzalez*, 597 F. Supp. 2d 76, 80 (D.D.C. 2009) (transferring action relating to application for adjustment of status processed in a Texas USCIS office to the U.S. District Court for the Northern District of Texas, noting that "[w]hile the claim arguably arose in more than one district, the claim involves identifiable relevant events occurring in the transferee district and virtually none in this district."); *Al–Ahmed v.*

*Chertoff*, 564 F.Supp.2d 16, 19 (D.D.C. 2008) (transferring action relating to application for adjustment of status, travel documents and employment authorization pending in a Virginia USCIS office to the U.S. District Court for the Eastern District of Virginia because "the relevant events giving rise to plaintiff's claim have occurred or will occur in that district" and although "plaintiff names as defendants certain high-level government officials with offices in this district, these individuals are not the ones who will adjudicate his applications"); *Abusadeh v. Chertoff*, No. 6–CV–2014, 2007 WL 2111036, at *6 (D.D.C. July 23, 2007) (transferring action relating to application for naturalization processed in a Texas USCIS office to the U.S. District Court for the Southern District of Texas because "Plaintiff, a resident of the Southern District of Texas, applied for naturalization in that District, was interviewed in connection with his application in that District, and has since communicated with the USCIS office in that District regarding his application").

As this court has stated in *Cameron v. Thornburgh*, "this circuit must examine challenges to personal jurisdiction and venue carefully to guard against" attempts to "manufacture venue in the District of Columbia." 938 F. 2d at 256. Even though Plaintiffs' memorandum in support of the TRO application attempts to correlate national administration of COVID-19 booster shots, "the connection between the events at issue in this case and the District of Columbia is still tenuous at best." *Bourdon*, 235 F. Supp. at 307. The remaining private interest factors have little influence on the decision. The Defendants' choice of forum for transfer would be the federal district where each plaintiff is located. This presents no barrier or hurdle for the presentation of any witnesses or the acquisition of discovery.

Like private interests, this Court has held that public interests also should be taken into consideration when adjudicating a transfer or severance claim. In *Vasser*, this Court held that public interest factors include: "(1) the transferee's familiarity with the governing law; (2) the relative congestion of the courts of the transferor and potential transferee; and (3) the local interest in deciding local controversies at home." *Vasser*, 72 F. Supp at 282.

The public interest factors also favor transfer and severance. This Court has held that "[t]he interest in deciding local controversies at home is the public interest factor of most importance[.]" *Bourdon*, 235 F. Supp. 3d at 308. To determine whether the case presents a local controversy, courts "consider a wide variety of actors, including where the challenged decision was made; whether the decision directly affected the citizens of the transferee state; the location of the controversy . . .; and whether there was personal involvement by a District of Columbia official." *Id.* Here, the alleged failures related to COVID-19 booster application all occurred at a local level. *See* Decls. attached as Exh. 1-4. Plaintiffs' allegations present a local controversy that should be decided by districts in which the named Plaintiffs are detained, as it is action in those facilities plaintiffs seek to compel. This "most importan[t]" factor weighs heavily in favor of transfer. *Bourdon*, 235 F. Supp. 3d at 308.

Even where there are multiple plaintiffs whose claims could be transferred to multiple different jurisdictions, severance and transfer is appropriate. "Courts have discretion to sever parties to effectuate transfer for judicial economy and convenience of the parties." *Pasem v. United States Citizenship & Immigration Servs.*, 2020 U.S. Dist. LEXIS 85818, *14 (D.D.C. May 15, 2020) (District court severed and transferred claims of ninety-five plaintiffs to the districts where the individual U.S. Citizenship and

Immigration Services centers that were adjudicating their citizenship petitions were located after weighing the public and private interests outlined above). *Id*. at *7-15. Therefore, upon consideration of the public and private interests, Plaintiffs' claims should be severed and transferred to the appropriate federal districts for adjudication.

    3.  <u>All Named Plaintiffs Are *Fraihat* Class Members</u>

Even if the Court chooses not to deny Plaintiffs' TRO as moot or sever and transfer their claims to the jurisdictions where the Plaintiffs are detained, Plaintiffs also cannot show that the facts and law are clearly in their favor in this matter because their claims are duplicative of an existing class action covering identical claims, which necessitates the denial of their TRO and transfer of their claims to the Central District of California based on Plaintiffs' *Fraihat* class membership.   The TRO Plaintiffs all are identified class members in the ongoing class action regarding ICE detention facilities, including the specific issues of COVID-19 vaccinations and care of medically vulnerable individuals. *See Fraihat, et al. v. U.S. Immigration and Customs Enforcement, et al*., Case No. 19-1546 (C.D. Cal.) (Bernal, J.), see also Dkt. 1, ¶¶ 28, 30, 32, 35.   As such, this case should be immediately transferred to the Central District of California because the claims, issues, relief, and parties in this case substantially overlap and interfere with the ongoing mediation efforts in *Fraihat*.

The "usual rule" in this Circuit is that "[w]here two cases between the same parties on the same cause of action are commenced in two different Federal courts, the one which is commenced first is to be allowed to proceed to its conclusion first." *Utahamerican Energy, Inc. v. Dep't of Labor*, 685 F. 3d 1118, 1124 (D.D.C. 2012) (quoting *Wash. Metro. Area Transit Auth. v. Ragonese*, 617 F. 2d 828, 830 (D.C. Cir. 1980). The D.C. Circuit

follows this rule because "[c]onsiderations of comity and orderly administration of justice dictate that two courts of equal authority should not hear the same case simultaneously." *Id*. This is particularly so in the context of class actions that have already been certified under Federal Rule of Civil Procedure 23(b)(2), where complete relief is to be granted on a class-wide basis.  *See* Fed. R. Civ. P. 23(b)(2) (Rule 23(b)(2)'s purpose is to permit *uniform* relief to be granted to the class as a whole, given that "[t]he primary goal[] of class action lawsuits [is] to avoid multiplicity of actions and the risk of inconsistent or conflicting adjudications." *Newburg on Class Actions* § 10:33 (5th ed.); *see Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 599 U.S. 393, 402 (2010) (Rule 23 is designed to "further procedural fairness and efficiency").

In *Fraihat*, the court provisionally certified two nationwide subclasses of ICE detainees based on their disability or higher risk of COVID-19 complications based on age, pregnancy, or specified chronic health conditions.  *See Fraihat*, Case No. 19-1546, Dkt. 133.  The court issued a series of orders addressing the class's conditions of confinement including that ICE:

1) issue a performance standard or supplement to the COVID-19 Pandemic Response Requirements, U.S. Immigration and Customs Enforcement and Removal Operations of Apr. 10, 2020 ("PRR") defining the minimum acceptable detention conditions for detainees with the identified Risk Factors; *see Fraihat*, Preliminary Injunction Order, Dkt. 132 at 38;

2) continue to update the performance standard consistent with expert guidance and the CDC Detention Guidance, with the goal of exceeding BOP and state prison system response levels; *see Fraihat*, Order Granting in Part Plaintiffs'

Motion to Enforce Preliminary Injunction, Dkt. 172 at 11; and

3)   make vaccines available to all subclass members; *see Fraihat*, Order Adopting

Special Master's First Report and Recommendation, Dkt. 312 at 2.

In October 2021, the Ninth Circuit reversed the preliminary injunction, (16 F.4th 613 (9th

Cir. 2021)), but the court's orders remain in effect because the Ninth Circuit Court of

Appeals's mandate has not issued while the parties engage in mediation.  *See Fraihat v.*

*United States Immigration & Customs Enf't*, Docket No. 20-55634 (9th Cir.).

Thus, the Named Plaintiffs' claims that any failure or delay by the government in

providing them COVID-19 mRNA vaccine booster shots is a constitutional violation are

directly tied to Defendants' compliance with the *Fraihat* court's orders as overseen by the

court-appointed special master and also may implicate the parties' settlement efforts.

This proposition is built on the longstanding principle that enforcement of an

injunction through a contempt proceeding must occur in the issuing court because contempt

is an affront to the court issuing the order. *See, e.g.*, *Leman v. Krentler-Arnold Hinge Last*

*Co.*, 284 U.S. 448, 452 (1932); *In re Debbs*, 158 U.S. 564, 594–95 (1895) ("[T]he power

of a court to make an order carries with it the equal power to punish for a disobedience of

that order, and the inquiry as to the question of disobedience has been, from time

immemorial, the special function of the [ordering] court . . . . To submit the question of

disobedience to another tribunal, be it a jury or another court, would operate to deprive the

proceeding of half its efficiency. . . . [T]he sole adjudication of contempts, and the

punishments thereof belong[] exclusively . . . to each respective court."), *abrogated on*

*other grounds by Bloom v. Illinois*, 391 U.S. 194 (1968).

Moreover, duplicative litigation is disfavored in the federal courts because of the

risk of inconsistent judgments, as well as the waste of parties' and judicial resources. *See Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817 (1976); *Ferens v. John Deere Co.*, 494 U.S. 516, 531 (1990) ("[t]o permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy, and money[]).   It is not necessary that the suits be "identical," just that "substantially the same parties are litigating substantially the same issues simultaneously in two fora." *Saddler v. AMEC Foster Wheeler Env't & Infrastructure, Inc.*, 253 F. Supp. 3d 210, 219 (D.D.C. May 26, 2017).

Because Plaintiffs are members of the *Fraihat*  class with similar claims already the subject of ongoing litigation, any decision by this Court risks the creation of inconsistent judgments, causing confusion and potentially inconsistent treatment among class members, and defeating the purpose of uniform prosecution and resolution of these claims via the class action vehicle.   Given the closeness of the claims, the risk of inconsistent judgments is particularly acute here,   especially where the district court in *Fraihat* already has ordered injunctive relief on behalf of the class that includes all four Plaintiffs, and Defendants already have made extensive efforts toward compliance with the preliminary   injunction   order.   *See*   Decl.   of   Dr.   Ada   Rivera; (https://www.ice.gov/doclib/coronavirus/  eroCOVID19responseReqsCleanFacilities.pdf). Further litigation in this Court would only impede the direction of resources toward the expeditious implementation of the *Fraihat* orders, ongoing efforts between the parties in *Fraihat* to continue responding to the ever-evolving COVID-19 pandemic, ongoing mediation efforts, and the prompt disposition of that case.

Accordingly, this Court should transfer the matter to the Central District of California. *Univ. Legal Servs. v. St. Elizabeth's Hosp.*, 2005 U.S. Dist. LEXIS 36132 (D.D.C. July 22, 2005) ("[W]hen an individual lawsuit filed by a class member raises claims of a nature similar to or overlapping with a pending class action, courts have consolidated the proceedings and included the individual complaint in the class action."). And Plaintiffs cannot, therefore, demonstrate the facts and law are clearly in their favor.

    4.  <u>Plaintiffs Cannot Establish a Fifth Amendment Violation</u>

Plaintiffs allege that the failure of ICE to provide an mRNA booster in the just over four months between the time the CDC first announced a recommendation for the administration of booster shots to certain at-risk populations on October 21, 2021 (Dkt. 1, ¶ 49), and the filing of this action on March 1, 2022, is a violation of their Fifth Amendment substantive due process rights. Specifically, Plaintiffs argue that the failure is an "unreasonable risk" to Plaintiffs' health and "constitutes punishment as it lacks a rational relationship to any legitimate governmental interest . . ." *See* Dkt. 2, pp. 20-35.

    a.     Plaintiffs Cannot Show a Fifth Amendment Violation Under the "Deliberate Indifference" Standard in Pretrial Detention Cases

In support of their position, Plaintiffs first argue that Defendants' failure to provide COVID-19 booster shots poses an unreasonable risk to Plaintiffs' health, that the Eighth Amendment prohibits exposing prisoners to "an unreasonable risk of damage to their health," and that the same principles apply to detainees through the Fifth Amendment's Due Process Clause. *Id*. at p. 21.

In this Circuit, both the Eight and Fifth Amendments apply to the conditions of confinement. The rights guaranteed by the Eight Amendment to convicted prisoners subject to penal incarceration also apply under the Fifth Amendment to non-penal

incarceration or confinement, including pre-trial and civil detainees. *Hardy v. District of Columbia*, 601 F. Supp. 2d 182 (D.C. Cir. 2009); *United States v. Riggins*, 456 F. Supp. 3d 138 (D.D.C. Apr. 27, 2020); *Reynolds v. Wagner*, 128 F.3d 166, 173, 188 (3d Cir. 1997). The difference between the two is that the Eight Amendment prevents "cruel and unusual punishment," whereas "a pretrial detainee, not yet found guilty of any crime, may not be subjected to punishment of any description." *Hardy*, 601 F. Supp. 2d at 188; *Riggins*, 456 F. Supp. 3d at 144. "Because a pretrial detainee's rights under the Fifth Amendment are at least as great as those afforded to a convicted prisoner under the Eighth Amendment, applying the Eighth Amendment "'deliberate indifference' standard to measure whether the plaintiffs have alleged a violation of their clearly established Fifth Amendment rights is appropriate." *Hardy*, 601 F. Supp. 2d at 189; but see *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, at n.31 (D.D.C. 2020) (noting that while the D.C. Circuit has not addressed the issue, "many circuit courts have extended [an "objectively unreasonable" standard] to apply to . . . due process claims by pre-trial detainees.").[3]

The deliberate indifference standard is not easily surmountable, as even malpractice does not rise to deliberate indifference—"deliberate indifference describes a state of mind more blameworthy than negligence." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). As it

---

[3] Defendants acknowledge that while the D.C. Circuit has not addressed this issue, many circuits have concluded that the objective reasonableness standard from *Kingsley v. Hendrickson*, 576 U.S. 389 (2015) applies in this context. *See C.G.B.*, 464 F. Supp. 3d at n. 31; *Banks v. Booth*, 2020 WL 1914896, at *6 (D.D.C. 2020), *appeal dismissed, cause remanded*, 518 F. Supp. 3d 57 (D.C. Cir. 2021) (holding a civil detainee "need only show that prison conditions are objectively unreasonable in order to state a claim under the due process clause"). However, the D.C. Circuit has not addressed this issue and therefore Defendants maintain that the proper standard for civil conditions-of-confinement claims is the subjective "deliberate indifference" standard articulated by the Supreme Court in *Wolfish* (*Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). Moreover, Plaintiffs cannot demonstrate a likelihood of success even under *Kingsley*'s objective standard as discussed below.

relates to medical services, this Circuit has noted that "courts will not intervene upon allegations of mere negligence, mistake or difference of opinion." *O.K. v. Bush,* 344 F. Supp. 2d 44, 61 (D.D.C. 2004) (citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir. 1977)). Absent a showing of misconduct that rises to the level of deliberate indifference, courts will not sit as boards of review over the medical decisions of prison officials, and they will not second-guess the adequacy of a particular course of treatment. *Bowring*, 551 F.2d at 48.

To prevail on a substantive due process claim of deliberate indifference, Plaintiffs must show both that Defendants' response to COVID-19 "poses an unreasonable risk of serious damage to [detainees'] future health," *Helling v. McKinney*, 509 U.S. 25, 35 (1993), and that Defendants have been deliberately indifferent to plaintiffs' wellbeing. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Neither general allegations of negligence nor a plaintiff's general disagreement with treatment received is enough to show deliberate indifference. *See Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976). Rather, deliberate indifference arises "only when the decision by the [medical] professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982).  In assessing whether government officials acted with a sufficient degree of recklessness to support a deliberate indifference claim, courts must consider the particular "constraints facing the official." *Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991).  Although "the [government's] responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities," that is not always the case. *Id*.

Accordingly, when, as here, the government undertakes reasonable efforts to protect detainees' health and safety, the government cannot be deemed deliberately indifferent to a detainee's wellbeing, even if the policies through which the government operates are imperfect or the methods chosen are later determined to be suboptimal by a reviewing court. *Farmer, 511 U.S. at 844-45*.  Moreover, past alleged deficiencies in ICE's response cannot support ongoing prospective injunctive relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 107-08 (1983) (requiring not just "past wrongs," but a showing of a "real and immediate threat" of future injury"). To support an injunction based on a finding of deliberate indifference, the court must find that the government is currently "knowingly and unreasonably disregarding an objectively intolerable risk of harm" and "will continue to do so . . . into the future." *Farmer v. Brennan*, 511 U.S. 825, 845-846 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)).

Defendants' extensive and continuing efforts to address and mitigate the risks that COVID-19 presents at detention facilities nationwide defeat any claim that they have been deliberately indifferent under this standard, especially in light of the constraints under which ICE has been operating.  Moreover, under either the subjective "deliberate indifference" standard from *Wolfish*, or the objective "reasonableness" standard from *Kingsley*, Plaintiffs cannot show a likelihood of success on the merits, as Defendants have taken timely and appropriate action to protect Plaintiffs, including providing booster vaccinations, as set forth below.

 The COVID-19 pandemic has presented the scientific and medical communities new and truly unique challenges.  As a result of ever-evolving developments in both areas, public procedures to stop and slow the spread of the virus, medical treatments of those

infected, and vaccination resources and protocols have changed on an almost week-to-week basis since the beginning of the pandemic in 2020.  Since that time, ICE has been proactive in protecting the health and safety of all detainees, following relevant CDC guidance as it evolves, and establishing extensive safety and vaccination protocols. *See* Rivera Decl. at ¶¶ 8-35.

Since the beginning of the pandemic, ICE epidemiologists have tracked the outbreak and issued guidance to ICE Health Services Corp ("IHSC') staff for the screening and management of exposure among detainees. *Fraihat* Dkt. 124-1. In April 2020, ICE issued the first PRR, which was "designed to establish consistency across ICE detention facilities by establishing mandatory requirements and best practices in all detention facilities housing ICE detainees."  Version 7 of the PRR was published on October 19, 2021.  *Id.*  Under the terms of the PRRs, facilities that hold ICE detainees must, among other things, "comply with the provisions of their relevant ICE contract or service agreement, [c]omply with the ICE national detention standards applicable to the facility," comply with CDC guidance, and take steps to identify and track detainees at high-risk for serious illness from COVID-19.  *Id.* at p. 8.  ICE has indeed provided "adequate protection against COVID-19" and have not put Plaintiffs at unreasonable risk.

With regard to COVID-19 boosters specifically, the CDC recommended boosters for at-risk groups beginning in mid-October, 2021, just a little more than four months prior to the filing of Plaintiffs' Complaint.  Dkt. 2, p.6.  ICE began administering booster shots in November, 2021, *see* Rivera Decl. at ¶ 24, and has updated its medical guidance to reflect changes in vaccine and booster practices, *see id.* at ¶¶ 24-35.   As of March 7, 2022, 54,237 detainees have elected to receive COVID-19 vaccinations while in ICE facilities,

and 1,525 boosters have been administered.  *Id*. at ¶¶ 31-32.  To be medically cleared for a booster, detainees must first either be fully vaccinated while in detention, or provide proof of prior vaccination.  *Id*. at ¶¶ 16, 27.  Vaccines (and boosters) for detention facilities initially were allocated to and distributed by state and local health departments as part of the total COVID-19 vaccine distribution by the federal government to each state.  *Id*. at ¶¶ 8-11.  In June 2021, ICE received a supply of Janssen vaccines which it made available to detention centers upon request, and ICE is working with DHS to expand access specifically to mRNA vaccines to align its actions with the December 16, 2021 guidance from the CDC encouraging mRNA vaccines over the Janssen vaccine.  *Id*.  These actions taken by the ICE demonstrate that the government actions with regard to Plaintiffs' detention are not objectively unreasonable and that the government did not intentionally or recklessly fail to provide adequate care to Plaintiffs.

Even if the Court was to accept as true Plaintiffs' assertions that there were "4.4 million new cases and over  61,557 new deaths in the past four weeks alone" (Dkt. 2, p. 4) (a substantial reduction from the "19.2 million new cases" cited by counsel for Plaintiffs in their prior lawsuit for the four weeks prior to its filing on January 31, 2022), as of March 7, 2022, only four detainees were currently hospitalized with COVID-19, and there have been only eleven deaths attributable to COVID-19 since the *beginning* of the pandemic, with the last occurring in October 2021, prior to the rise in infection numbers due to the Omicron variant.  *See* Rivera Decl. at ¶¶ 34-35.  While ICE works to avoid even a single death, these numbers show the success of the actions ICE has taken to protect detainees, including Plaintiffs.  These are not numbers that support Plaintiffs' contentions that Defendants' practices regarding COVID-19 boosters amount to deliberate indifference to

Plaintiffs' medical needs.  On the contrary, these numbers show Defendants' COVID-19 protocols, including the administration of booster vaccinations, have been highly effective at preventing serious illness and deaths amongst even medically vulnerable detainees. Plaintiffs cannot, therefore, show the facts and law are clearly in their favor for this claim.

      b.     Plaintiffs' Allegations of Punishment in Violation of the Fifth Amendment

In their memorandum, Plaintiffs state that "failure to provide adequate protection against COVID-19 in jail or detention" is punishment in violation of their Fifth Amendment due process rights.  Dkt. 2 at p. 22.  In support of this punishment proposition, Plaintiffs first argue that "the evidence from multiple COVID-19 lawsuits targeting ICE detention facilities across the country, as well as Plaintiffs' declarations, demonstrate that any mitigation efforts Defendants have implemented are falling short of preventing the spread of the virus in detention facilities."  *Id*. at p. 23.  The fact that lawsuits are filed against the government is not, however, evidence of anything other than that our judicial system is available to detainees and that it is functioning.  Neither does the mere fact that ICE has been unable to prevent all COVID-19 infections in ICE detention centers amount to proof that Defendants have acted with deliberate indifference.  As can be seen in the news daily, despite the best efforts of doctors, nurses, and epidemiologists using the very best equipment and safety protocols, COVID-19 spreads within even hospital settings, including to fully vaccinated and "boosted" health care professionals treating infected patients.  *See* article "As Omicron Surged, Non-Covid-19 Patients Contracted Virus in Hospitals in Higher Numbers," Wall St. J. (Feb. 18, 2022).  Evidence of COVID-19 transmission within detention facilities, without significantly more as set forth *supra*,

therefore cannot amount "deliberate indifference" and punishment in violation of the Fifth Amendment.

Plaintiffs next argue that Plaintiffs' detention without booster shots is punishment because Plaintiffs have medical vulnerabilities and live in congregate detention settings— no matter how successful the mitigation measures ICE takes may be.  "Mitigation measures to reduce the spread of COVID-19 are therefore not replacements for booster shots in constitutional, or practical and medical, senses." Dkt. 2, p. 23.  Plaintiffs' support for this statement is the fact that "immunity provided by the initial vaccine doses wanes over time" and that failure to offer booster shots to Plaintiffs prevents them from "being able to take the preventative and precautionary steps that the larger, non-detained population has been able to take to slow the spread of COVID-19." *Id*. at pp. 23-24.  While Defendants do not agree with the conclusions of Plaintiffs' purported experts, their statements regarding the risk of COVID-19 to immigration detainees and the risk posed by the lack of boosters do not advance their claims because Defendants are providing boosters and afford a wide range of other COVID-19 protections.  Further, the inability of ICE to provide Plaintiffs with mRNA booster vaccinations in a period of less than five months is not "misconduct that rises to the level of deliberate indifference."  *O.K. v. Bush,* 344 F. Supp. 2d at 61.  Courts have determined that "mere delay" in treatment does not state a claim for violation of the Eight Amendment," *Charles 2X v. District of Columbia*, 834 F. Supp. 439, 442 (D.D.C. April 14, 1992), absent "some substantial harm to the patient."  *Webb v. Hamidullah*, 281 Fed. Appx. 159, 167 (4th Cir. 2008).  Here, Plaintiffs have shown no substantial harm.  They have not all acquired COVID-19, and even those who have were

not hospitalized and have suffered no long-term effects, and now all have received, or have been offered but rejected, booster vaccinations.

Plaintiffs next argue that "Defendants' failure to provide COVID-19 booster shots to Plaintiffs constitutes unlawful punishment and violates Plaintiffs' due process rights because their inaction is not "rationally related to a legitimate nonpunitive purpose or . . . appear[s] excessive in relation to that purpose."" Dkt. 2 at p. 28.   Conditions of confinement that are "reasonably related to a legitimate Governmental objective" do not "amount to 'punishment.'" *Bell v. Wolfish*, 441 U.S. at 539. So long as confinement serves a "legitimate governmental purpose" and is not excessive, it is not an impermissible "punishment" in violation of due process. *Id*. at 538-39.  Plaintiffs each are held in custody for legitimate governmental purpose:  Escalante is held due to a criminal history of burglary, arson, assault, and illegal entry (Floyd Decl. at ¶ 5); Sorokin is held due to a criminal history of grand larceny and theft of services (Almodovar Decl. at ¶ 7); Hernandez Herrera is held due to immigration fraud (McGregor Decl. at ¶¶ 6-7); and Gonzalez is held due to conviction of assault with a firearm (an assault weapon) (Suazo Decl. at ¶ 7). In maintaining custody of Plaintiffs in detention facilities, the government protects the public and ensures that the Nation's immigration laws are properly enforced. The Supreme Court has recognized that preventing detained aliens from absconding and ensuring that they appear for removal proceedings, as well as protecting the community from dangerous criminal aliens, are legitimate governmental objectives.  *See Jennings*, 138 S. Ct. at 836. Indeed, "deportation proceedings 'would be vain if those accused could not be held in custody pending the inquiry into their true character.'" *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quoting *Wong Wing v. United States*, 163 U.S. 228, 235 (1896)).  Congress has

further vested discretion in ICE to determine whether continued custody of an individual detainee is necessary to further the government's objectives—discretion that ICE exercises through individualized assessments of flight risk, danger to the community, and other factors.   *See* 8 U.S.C. § 1182(d)(5); 8 C.F.R. § 236.1(c)(8).   Plaintiffs' continued confinement is thus "reasonably related" to multiple legitimate government interests. The risks associated with COVID-19 do not change these interests, which justify Plaintiffs' continued detention.

As set forth herein, the extensive steps ICE has taken to combat COVID-19 at detention facilities nationwide confirm that Plaintiffs' confinement is reasonably related to achieving the government's legitimate purposes.   Plaintiffs' detention also is not "excessive," because it is reasonably related to fulfilling ICE's legitimate purpose of enforcing immigration law. *Bell*, 441 U.S. at 538.   As the Supreme Court has emphasized, "[t]he wide range of 'judgment calls' that meet constitutional and statutory requirements [for federal detention] are confided to officials outside of the Judicial Branch of Government." *Id*. at 562.   The Constitution thus leaves the government latitude in determining the means by which it may achieve its legitimate interest of executing the Nation's immigration laws.   In evaluating those determinations, courts must be careful to impose only what the Constitution requires—not "a court's idea of how best to operate a detention facility." *Id*. at 539.   Thus, the only question for the Court here is whether, in light of the government's unquestionably strong interest in keeping detainees confined, the means of achieving that end were "excessive." *Id*. at 538.   Plaintiffs fell well short of demonstrating that the government's confinement of detainees is so excessive that it evinces "an expressed intent to punish on the part of detention facility officials." *Id*.

5.  <u>A TRO is Not Necessary to Prevent Irreparable Injury</u>

In order to prevail on a motion for TRO, Plaintiffs are required to demonstrate an irreparable injury, which Plaintiffs have not done here.  *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."). "[P]roving 'irreparable' injury is a considerable burden, requiring proof that the movant's injury is '*certain*, *great*[,] and *actual*—not theoretical—and *imminent*, creating a clear and present need for extraordinary equitable relief to prevent harm." *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  Here, Plaintiffs describe their medical vulnerability, and then describe how COVID-19 cases have increased in detention facilities, and allege the "lack of any plan to provide COVID-19 booster shots to eligible individuals in detention."  Dkt. 2, p.34.  But as described herein, and in the accompanying declarations, ICE and its detention centers have a plan for administering boosters and are in fact administering those boosters, including to Plaintiffs.  Furthermore, ICE has created and implemented protocols and procedures, to prevent and mitigate the risk of harm to Plaintiffs. *See also C.G.B.,* 2020 WL 2935111 at *2-4 (outlining steps ICE and the CDC have taken to contain the virus in detention facilities).  Furthermore, ICE has implemented measures specifically to identify and protect residents who are especially vulnerable and with high risk factors, which is the very subject of the *Fraihat* PI and the ongoing monitoring by the special master in that case.

In light of the actions taken by ICE, and the protocols and procedures already in place expressly to protect medically vulnerable individuals, Plaintiffs cannot show certain, imminent threat of harm that requires extraordinary equitable relief.

 6.   The Threatened Injury Does Not Outweigh the Harm a TRO Would Inflict on
      the Government and Would Be Adverse to the Public Interest

Finally, Plaintiffs have not demonstrated that "the balance of equities tips in their favor," and that "an injunction is in the public interest." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).  The government addresses these last two factors jointly, because where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

As detailed herein, the government has taken significant actions to address the needs of its detainees – to include medically vulnerable detainees.  ICE and DHS continue those efforts, and continue to update their actions to provide the best care possible under the fast-changing parameters of the COVID-19 pandemic.  Those efforts cover all areas of COVID-19 prevention, treatment, facility management, adherence to CDC guidelines, and include plans and implementation of vaccinations and booster vaccinations.  *See* Rivera Decl. at ¶¶ 13-35. ; ICE PRRs.  That the administration of booster vaccines to these three detainees did not proceed as quickly as they would have wanted does not balance the equities in their favor.  This is especially true when the government is engaged already in the *Fraihat* class action, which specifically includes four of the plaintiffs (and all of the TRO plaintiffs).  The government and public interest in providing uniform relief to a class as a whole, avoiding a multiplicity of actions, risk of inconsistent or conflicting

adjudications heavily outweighs the risk to Plaintiffs, and a ruling to the contrary would be harmful to those interests.

### III. Conclusion

Plaintiffs fail to establish that the facts and law both clearly weigh in their favor because they are moot and otherwise would fail on the merits given ICE's actions. Furthermore, Plaintiffs' claims are subject to severance and transfer to the jurisdictions where the actions at issue (or lack thereof) are centered, are already the subject of an ongoing class action of which they are members, and cannot establish violations of their rights under the Fifth Amendment.  The Court therefore should deny the TRO motion requested by Plaintiffs.

Dated March 8, 2022.


BRIAN M. BOYNTON
Principal Deputy Asst. Atty. General
Civil Division

JEFFREY S. ROBINS
Deputy Director
Office of Immigration Litigation

/s/ Jennifer A. Youngs_____
Jennifer A. Youngs
N.C. Bar No. 23925
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 451-7338
Fax: (202) 305-7000
Email: jennifer.a.youngs@usdoj.gov

Shane Young
D.C. Bar No. 1620020
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Phone:  (202) 532-4946

Fax:  (202) 305-7000
Email:  Shane. A.Young@usdoj.gov

*Attorneys for Federal Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 8, 2022, I electronically filed the foregoing RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER with the Clerk of Court by using the CM/ECF system, which will provide electronic notice and an electronic link to this document to all attorneys of record.

<u>/s/*Jennifer A. Youngs*</u>
Jennifer A. Youngs
Trial Attorney
N.C. Bar No. 23925